# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

CONSUMER FINANCIAL PROTECTION BUREAU,

       Plaintiff,

       v.

PENNSYLVANIA HIGHER EDUCATION ASSISTANCE AGENCY, THE NATIONAL COLLEGIATE MASTER STUDENT LOAN TRUST I, THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2003-1, THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2004-1, THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2004-2, THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-1, THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-2, THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-3, THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-1, THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-2, THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-3, THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-4, THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-1, THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-2, THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-3, and THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-4,

       Defendants.

Case No.

**COMPLAINT FOR PERMANENT INJUNCTION AND OTHER RELIEF**

**JURY DEMAND**

The Consumer Financial Protection Bureau (Bureau) brings this action against Pennsylvania Higher Education Assistance Agency (PHEAA) and fifteen (15) National Collegiate Student Loan Trusts (NCSLTs or the Trusts) (collectively Defendants), and alleges the following:

## INTRODUCTION

1.      Individuals and families facing financial difficulties have to make tough choices about how to prioritize and organize their spending. In these circumstances, timely and accurate information is essential. This was especially true during the unprecedented circumstances millions of American student loan borrowers faced in the early months of the COVID-19 pandemic. But thousands of borrowers whose loans were owned by the NCSLTs and serviced by PHEAA were denied the critical information they needed in just such circumstances. Indeed, many of these borrowers were denied even the most basic information when they sought help from PHEAA and the Trusts: a simple yes or no response to requests for relief. For years, the Trusts failed to respond to borrowers' requests for payment relief, and PHEAA failed to give accurate and useable information to borrowers seeking help. Instead, at times, PHEAA told borrowers that they needed to go to the Trusts for assistance, despite knowing that the Trusts were non-responsive and this would be a futile waste of time for borrowers.

These failures caused significant consumer harm.

2.     The Trusts are business entities that acquire and hold pools of private student loans, collect on and provide for the servicing of those loans, and issue interest-bearing securities to investors backed by proceeds from student loan payments. The Trusts use an array of trustees and servicers, whose roles are defined by numerous interlocking agreements, to help carry out these functions.

3.     PHEAA is a student loan servicer and has been the primary servicer for performing loans held by the Trusts since at least 2006. In its capacity as servicer for the Trusts, PHEAA interacts with borrowers on the Trusts' behalf. This includes accepting loan payments and accepting and responding to borrower requests, such as requests for reduced payment amounts, forbearance, or deferment.

4.     In servicing loans for the Trusts, PHEAA acted as the Trusts' agent. It agreed to communicate with borrowers, manage their loan accounts, and collect payments from them on the Trusts' behalf and for the Trusts' benefit. PHEAA accepted and followed directions from the Trusts on how to conduct these activities.

5.     The Servicing Guidelines that govern how PHEAA services loans on the Trusts' behalf do not provide it with the authority to decide

certain borrower requests, such as requests to release co-signers from loans, extend forbearances, or compromise or settle outstanding loan balances.

6.     Prior to 2015, PHEAA forwarded such requests to certain other NCSLT-related entities for decision as Exception Requests.

7.     In or about 2015, disputes arose between various stakeholders in the Trusts. These disputes led to a general breakdown in the Trusts' management and governance and rendered the process for deciding Exception Requests non-functional. From 2015 to 2021, thousands of borrower Exception Requests for various forms of payment relief went unanswered.

8.     During this time, PHEAA gave borrowers the misleading impression that their Exception Requests would receive a substantive response from the NCSLTs, despite knowing they would not.

9.     Beginning in March 2020, thousands of borrowers contacted PHEAA seeking temporary payment forbearance because of the COVID-19 pandemic. PHEAA had authority to grant these borrowers temporary forbearances for a natural disaster but mishandled some of them, improperly denying some requests that should have been granted and

3

putting others on hold.

10.    PHEAA also mishandled borrower requests seeking forbearance extensions due to ongoing impacts from the pandemic. PHEAA represented to those borrowers that it would seek permission for such an extension from the NCSLTs. But PHEAA did not inform borrowers that the NCSLTs were not responding to these requests and had not substantively responded to Exception Requests since 2015. PHEAA also failed to advise some of these borrowers on other forms of payment relief that may have been readily available, such as reduced payment plans or other forms of forbearance.

11.    PHEAA and the Trusts did not substantively respond to these requests for forbearance extensions until the fall of 2020, when PHEAA denied all requests to extend COVID-related payment forbearance, after leaving borrowers without answers to their requests, or payment relief, for months.

12.    The Bureau brings this action under the Consumer Financial Protection Act of 2010 (CFPA), 12 U.S.C. §§ 5531, 5536(a), 5564(a), 5565, to obtain permanent injunctive relief, restitution, refunds, damages, civil money penalties, and other appropriate relief for Defendants' violations of Federal consumer financial law in connection with Defendants' ownership

and servicing of private student loan debt.

## JURISDICTION AND VENUE

13.    The Court has subject-matter jurisdiction over this action because it is brought under Federal consumer financial law, 12 U.S.C. § 5565(a)(1), presents a federal question, 28 U.S.C. § 1331, and is brought by an agency of the United States, 28 U.S.C. § 1345.

14.    Venue is proper in this District because PHEAA is located in and does business in this District and the NCSLTs do business in this District. 12 U.S.C. § 5564(f).

## PLAINTIFF

15.    The Bureau is an independent agency of the United States charged with regulating the offering and provision of consumer financial products or services under Federal consumer financial laws. 12 U.S.C. § 5491(a). The Bureau has independent litigating authority to enforce Federal consumer financial laws, including the CFPA. 12 U.S.C. §§ 5531(a), 5564(a)–(b).

## DEFENDANTS

16.    Pennsylvania Higher Education Assistance Agency (PHEAA) (d/b/a American Education Services or AES) is a public corporation organized under the laws of the Commonwealth of Pennsylvania with its

principal office located in Harrisburg, Pennsylvania. As of December 2023, PHEAA serviced a portfolio of student loans worth roughly $17.8 billion.

17.    The National Collegiate Student Loan Trusts (NCSLTs or the Trusts) are a group of fifteen securitization trusts organized under Delaware Statutory Trusts Act, Del. Code Ann. tit. 12, §§ 3801 *et seq*., from 2003-2007 for the purpose of acquiring and pooling student loans, providing for their servicing and collection, and issuing and paying notes as securities backed by student loan income. By name, the Trusts are The National Collegiate Master Student Loan Trust I, The NCSLT 2003-1, The NCSLT 2004-1, The NCSLT 2004-2, The NCSLT 2005-1, The NCSLT 2005-2, The NCSLT 2005-3, The NCSLT 2006-1, The NCSLT 2006-2, The NCSLT 2006-3, The NCSLT 2006-4, The NCSLT 2007-1, The NCSLT 2007-2, The NCSLT 2007-3, and The NCSLT 2007-4. As of February 29, 2024, the Trusts collectively held approximately 163,000 private student loans with approximately $907 million in outstanding balances.

18.    PHEAA is a "covered person" under the CFPA, 12 U.S.C. § 5481(6)(A), because it offers or provides a "consumer financial product or service" by engaging in servicing student loans and collecting debt. 12 U.S.C. § 5481(5), (15)(A)(i), (15)(A)(x).

19.    The NCSLTs are "covered person[s]" under the CFPA, 12 U.S.C.

§ 5481(6)(A), because they offer or provide a "consumer financial product or service" by engaging in extending credit and servicing loans, including acquiring, and purchasing private student loans, and by collecting debt. 12 U.S.C. § 5481(5), (15)(A)(i), (15)(A)(x).

## FACTUAL ALLEGATIONS

## THE TRUSTS' STRUCTURE

20.    For each of the NCSLTs, the rights, obligations, and powers of the Trusts' stakeholders, as well as their relationships to each other, are defined by a series of interlocking contracts, referred to herein as the Trust Related Agreements. These include, among other agreements, a Trust Agreement, an Indenture, and an Administration Agreement.

21.    The Trust Agreement provides that the Trusts act through their Owner Trustee. The Owner Trustee, Wilmington Trust Company (Wilmington), may only act or refrain from acting, as to a non-ministerial matter, upon instruction from the Trusts' Owners.

22.    The Trusts' Owners hold residual or reversionary interests in the Trusts' property (primarily, the student loans). The Owners may direct the Owner Trustee to act so long as that action is consistent with the Trust Related Agreements.

23.     The Administration Agreement defines the role of the Administrator and provides that the Administrator will perform the duties of the Trusts and the Owner Trustee on behalf of the Trusts that are required by the Trusts' Indenture and Trust Agreement.

24.     The Administrator for the Trusts was initially First Marblehead Data Services, Inc., who was later succeeded by Goal Structured Solutions Data Services, LLC (Goal).

25.     The Special Servicing Agreement governs the servicing and collection of non-performing loans by the Special Servicer, which was initially First Marblehead Education Resource, Inc. (FMER), but has been U.S. Bank since FMER resigned in 2012. U.S. Bank subcontracted the servicing and collection of defaulted loans to NCO Financial Systems, Inc. (NCO). NCO was succeeded by its affiliate Transworld Systems, Inc. (TSI) as the Special Subservicer.

**THE RELATIONSHIP BETWEEN THE TRUSTS AND PHEAA**

26.     PHEAA services performing loans for the Trusts pursuant to the Servicing Agreement. Under the Servicing Agreement, PHEAA agreed to provide certain services such as "[b]orrower communications," "procedures for delinquency and default[,]" and disbursement. The Servicing Guidelines—appended to the Servicing Agreement as an exhibit—dictate

8

how PHEAA services loans for the Trusts. Among other things, the
Servicing Guidelines outline the forms of payment relief that PHEAA is
authorized to offer to NCSLT borrowers, provide eligibility criteria for those
options, and direct PHEAA on how and when they may be offered.

27.    Under the Servicing Agreement, PHEAA "shall provide and
perform" its loan servicing "in full compliance with[,]" among other things,
the Servicing Agreement, the Servicing Guidelines, and all laws applicable
to PHEAA and the Trusts.

28.    The Servicing Agreement gives the Trusts the right to direct,
among other things, the form and substance of PHEAA's correspondence to
borrowers, criteria for assessment of late fees, and PHEAA's engagement of
subcontractors to perform its services. The Servicing Agreement also gives
the Trusts the right to audit all of PHEAA's records related to servicing of
NCSLT loans.

## THE SERVICING GUIDELINES AND BORROWER EXCEPTION REQUESTS

29.    The Servicing Guidelines provide criteria for PHEAA or the
loans' former guarantor, The Educational Resources Institute Inc. (TERI),
to grant various forms of borrower requests, such as requests for
deferment, forbearance, or temporary modified repayment.

30.     For borrower requests that fall outside the scope of PHEAA or TERI's authority, the Servicing Guidelines further provide that exceptions may be made if they are approved in writing by TERI or TERI's agent, the current owner of the loan, and the Servicer.

31.     When a borrower asks for something that PHEAA lacks authority to grant it refers to the borrower's request as an Exception Request. These can arise because the Servicing Guidelines explicitly call for TERI's approval (such as for a co-signer release) or because the Servicing Guidelines do not specifically address the relief sought. Exception Requests generally involve some form of borrower payment relief such as requests for a co-signer release, extension of forbearance or deferment beyond the time permitted in the Servicing Guidelines, settlement, loan forgiveness, Servicemember Civil Relief Act (SCRA) benefits, or other forms of payment or interest rate reduction.

32.     TERI declared bankruptcy in 2008, after which, the Trusts, acting through their Administrator, instructed PHEAA how to service their loans through a series of Read and Agreed Letters, issued between 2008 and 2012, that amended the Servicing Guidelines.

33.     A November 5, 2008 Read and Agreed Letter directed that Exception Requests should be sent to FMER, rather than TERI, for

decision. Once NCO had assumed FMER's role as Special Servicer in 2012, PHEAA began sending Exception Requests to NCO. From 2012 until 2015, NCO decided Exception Requests and either PHEAA or NCO communicated the decision to borrowers.

34.    From 2015 to 2021, PHEAA received thousands of borrower requests about NCSLT loans. Some common types of borrower requests during this period included requests for: (1) co-signer release, (2) temporary modified repayment and hardship forbearance, (3) natural disaster forbearance, (4) deferment, (5) loan settlement or forgiveness, and (6) SCRA benefits.

### *Co-Signer Release*

35.    Many private student loan borrowers have co-signers—often the borrower's parent, spouse, or other relative—who share responsibility for the debt with the student borrower. Some NCSLT loans include provisions allowing for a co-signer to be released from the debt obligation after the borrower meets certain criteria.

36.    The Servicing Guidelines enumerate a multi-step approval process for co-signer release applications. First, PHEAA must confirm that the loan meets threshold eligibility criteria, including loan type and year of issuance. PHEAA must then review the loan payment history to ensure that

the borrower has made 48 consecutive on-time payments and has no prior uses of forbearance. Lastly, the borrower must meet the credit criteria, which includes but is not limited to, having no delinquencies greater than 60 days in the past two years. Prior to declaring bankruptcy, TERI completed the step of determining credit eligibility. Thus, PHEAA would screen the loan for threshold eligibility, deny co-signer release requests that did not satisfy the threshold requirements, and thereafter send eligible co-signer release requests that satisfied the threshold requirements to TERI—and later to FMER, and then to NCO—for credit review and final determination as an Exception Request.

### *Temporary Modified Repayment and Hardship Forbearance*

37.   When borrowers requested assistance because they were struggling to afford their monthly payments, PHEAA might be able to offer one of several modified repayment or forbearance options under the Servicing Guidelines and their Read and Agreed Letter amendments.

38.   PHEAA could offer borrowers a Reduced Payment Plan (RPP). Under this option, PHEAA would elicit a proposed monthly payment amount from the borrower that had to exceed a required minimum. Borrowers could use an RPP for up to 24 months in three-month

increments, but the combined total time in an RPP or on a hardship forbearance could not exceed 24 months over the life of the loan.

39.    PHEAA could also offer borrowers a Modified Graduated Repayment Schedule (MGRS). Under this option, a borrower would pay 50% of the regular monthly payment for 12 months, and then make interest-only payments for 12 months. PHEAA could approve an MGRS plan for a borrower in addition to the 24 months permitted for the combination of RPP and hardship forbearance.

40.    Hardship forbearance was available to borrowers in 3-month increments for a maximum of 12 months over the lifetime of the loan. During hardship forbearance, interest on the loans accrued and was capitalized when it ended.

41.    The Servicing Guidelines and Read and Agreed Letters dictated the order in which PHEAA should offer these options to borrowers struggling to make regular payments. As of 2011, they directed PHEAA to: (1) ask a borrower if a loan's co-signer can make the payments, (2) offer an MGRS, (3) offer an RPP, and (4) offer hardship forbearance.

42.    When borrowers requested payment relief that exceeded these parameters, PHEAA's practice was to send such requests to NCO as an Exception Request.

### *Natural Disaster Forbearance*

43.    When a borrower's home or employment is affected by a natural disaster, the Servicing Guidelines allow the servicer to grant up to three months of Natural Disaster Forbearance (NDF).

44.    If a borrower affected by a natural disaster needs any continuation of forbearance beyond the three-month NDF, the Servicing Guidelines require the borrower to request a hardship forbearance.

### *Deferment*

45.    The Servicing Guidelines include various forms of deferment for borrowers in certain stages of life, such a borrower in school or medical residency.

46.    Members of the U.S. Armed Forces in active-duty status can receive a deferment of up to 36 months.

47.    When borrowers requested deferment that exceeded the parameters in the Servicing Guidelines, PHEAA's practice was to send such requests to NCO as an Exception Request.

### *Loan Settlement or Forgiveness*

48.    The Servicing Guidelines provide no instructions regarding settlement or forgiveness for performing loans.

49.    When borrowers requested loan settlement or forgiveness, PHEAA's practice was to send such requests to NCO as an Exception Request.

### *The Servicemembers Civil Relief Act*

50.    The Servicing Guidelines provide no instructions regarding SCRA benefits.

51.    The SCRA caps the interest rate for loans to servicemembers on active duty at 6%. *See* 50 U.S.C. § 3937(a). The interest rate cap applies to loans that were taken out before the active-duty period began, and the servicemember is to invoke the benefit no later than 6 months after the active-duty period ends. *See* 50 U.S.C. § 3937(a)(1), (b)(1)(A). In lieu of notice from the borrower, a creditor may use information retrieved from a database managed by the Department of Defense, the Defense Manpower Data Center, indicating that the servicemember is on active duty. *See* 50 U.S.C. § 3937(b)(1)(B).

52.    It was PHEAA's practice to regularly check whether borrowers were on active duty status by accessing the Defense Manpower Data Center, and to send an Exception Request for: (1) borrowers who had not invoked benefits but were eligible for them, (2) borrowers who had invoked benefits

more than six months after the end of active duty service, and (3)
borrowers who took out a loan while in active duty status.

**THE TRUSTS' REFUSAL TO DECIDE EXCEPTION REQUESTS**

53.    Beginning in or around 2014, a series of disputes between the
Trusts' Owners and the various other NCSLT-related entities resulted in
several lawsuits. Among other topics, the parties disputed how certain
authorities and decision-making rights were distributed among the Trusts'
stakeholders, and which stakeholders could issue directions to others
regarding certain Trust operations.

54.    Up until October 2015, when an NCSLT borrower or co-signer
made a request that PHEAA did not have authority to approve under the
Servicing Guidelines, PHEAA's practice was to send that request to TERI or
TERI's successor—first FMER, then NCO—for decision as an Exception
Request.

55.    On October 20, 2015, the Trusts, acting through the
Wilmington, sent a letter to PHEAA which advised that NCO lacked the
authority to act on behalf of the Trusts and stated that the only parties
empowered to give PHEAA direction under the Servicing Agreement were
the Owners or the Trusts through the Owner Trustee.

56.    In response, on October 27, 2015, PHEAA began sending borrower Exception Requests by e-mail to Wilmington as the Owner Trustee.

57.    On November 2, 2015, the Trusts, acting through Wilmington, sent PHEAA a letter which stated that "neither the Owners, the Trusts, nor the Owner Trustee have the obligation or duty to respond" to Exception Requests, referencing "those certain emails sent by PHEAA to the Trusts care of Wilmington Trust Company in reference to various borrower exception requests[.]"

58.    On November 6, 2015, PHEAA sent a letter to Wilmington seeking clarification on how it should handle Exception Requests and whether it should resume sending Exception Requests to NCO for decision. PHEAA's November 6, 2015 letter further stated that it would continue to send Exception Requests to the Trusts via the Owner Trustee until it received alternative direction.

59.    The Trusts did not respond to PHEAA's November 6, 2015 letter through the Owner Trustee. Instead, on November 21, 2015, Chaitman LLP, which represented itself as "special litigation counsel [to] the Trusts[,]" sent PHEAA a letter in response stating, "as to your inquiry regarding exceptions, it is not within the Trusts' power to grant or withhold

them, nor within my purview to counsel PHEAA on how, in accordance with its applicable undertakings, it should deal with obtaining them."

60.    On December 9, 2015, in response to PHEAA's continued emails to Wilmington containing Exception Requests, a Wilmington executive replied by email stating that the Owner Trustee "does not have the authority to decide/comment on matters regarding loans held in the trusts."

61.    PHEAA continued to send Exception Requests by e-mail to Wilmington in its capacity as Owner Trustee. And consistent with its representations to PHEAA, Wilmington did not substantively respond to the Exception Requests it received; neither did the Trusts.

62.    On August 27, 2020, a Delaware chancery court issued a ruling that addressed many of the NCSLT-related entities' disputes over their respective authority to direct the Trusts.

63.    There was no further communication from the Trusts on the resolution of Exception Requests until at least November 2020.

64.    On November 23, 2020, the Trusts, acting through the Owner Trustee, sent a letter (November 2020 direction letter) to PHEAA and Goal delegating to Goal as the Administrator "the authority to act on behalf of the Trusts with respect to decisions and/or resolutions with respect to

18

Exception Requests and related servicing instructions[.]" The November 2020 direction letter directed PHEAA to forward Exception Requests to Goal, which could forward such requests to a designated special subservicer, such that "Exception Requests shall be processed and/or student borrowers' questions attended to in a timely manner. . . "

65.    PHEAA responded by letter confirming its agreement and that the instructions in the November 2020 direction letter "shall hereafter comprise a part of the Servicing Guidelines."

66.    On April 19, 2021, Goal sent a letter to PHEAA, which rejected the Trusts' November 2020 direction letter and stated that Goal was taking no action to process Exception Requests. But Goal's letter also opined that, "many of the situations PHEAA has labeled as Exception Requests are not exceptions or are expressly prohibited by the transaction documents and can be handled directly by PHEAA without the involvement of any other transaction party."

67.    Acting in accordance with the Trusts' November 2020 direction letter, PHEAA interpreted this April 2021 letter as a direction from the Administrator concerning Exception Requests.

68.    PHEAA overhauled its process for borrower Exception Requests in May 2021, in accordance with its interpretation of Goal's April 2021

direction letter. For nearly all types of borrower requests that PHEAA had previously classified as Exception Requests and sent to NCO or Wilmington, PHEAA now instructs its employees to approve or deny those requests for exception from the Servicing Guidelines. For co-signer release requests that meet the threshold eligibility requirements, PHEAA representatives now send those requests to Special Subservicer TSI for decision.

69.    Until at least May 2021, PHEAA continued to send Exception Requests to the Trusts despite knowing since at least November 2015 that the Trusts would not respond to them.

70.    PHEAA addressed the backlog of many pending Exception Requests in accordance with its interpretation of Goal's April 2021 direction letter. For loans it still serviced, PHEAA denied most pending requests for forgiveness, settlement, extensions of deferment or forbearance, or other forms of payment relief.

71.    PHEAA approved most pending requests for SCRA benefits, and retroactively applied the 6% interest rate cap to eligible borrowers. But for some SCRA borrowers, this relief came too late. Dozens of borrowers whose SCRA Exception Requests were not answered, but who were likely

eligible for an SCRA interest rate reduction, defaulted on their payments and had their loans charged-off.

72.    TSI began deciding new requests for co-signer release on behalf of the NCSLTs in October 2021. Nearly all co-signer release requests made between at least October 2015 and October 2021 were never decided and remain pending.

73.    Between 2015 and 2021, the Trusts failed to timely respond to Exception Requests from at least 5,390 borrower accounts.

## PHEAA'S REPRESENTATIONS TO BORROWERS ABOUT EXCEPTION REQUESTS

74.    It was PHEAA's practice to advise borrowers that submitted a request that their request would be reviewed within 7-10 business days. PHEAA would then send these individual requests to the Trusts, via Wilmington, by e-mail as Exception Requests. Once an individual Exception Request had been pending with Wilmington for ten days, PHEAA automatically generated a letter to the borrower which stated "Please be advised that this exception request was forwarded to the owner of your student loan for a determination. As of today's date, the owner of your loan has not provided a response to this request." This closed the task in PHEAA's system, so borrowers would receive no further communications

about the request unless they contacted PHEAA to ask again about the status of their request.

75.   When a borrower called PHEAA back to follow-up on the status of an Exception Request to which the borrower had never received a substantive response, PHEAA's customer service representatives responded by offering to submit a new Exception Request to the Trusts for review. This started the cycle over again.

76.   PHEAA did not inform borrowers that the Trusts' process for deciding Exception Requests was non-functional, or that the Trusts were not deciding Exception Requests, and thus their Exception Request would not be answered. This obscured from borrowers the underlying circumstances relevant to their financial obligations and deprived them of material information with which to make important personal financial decisions.

77.   Beginning in approximately March 2020, if a borrower sought to contact their loan holder directly, often for the purpose of escalating their pending Exception Request, PHEAA's policy and procedure was to provide borrowers with contact information for Wilmington. In or around January 2021, PHEAA began providing borrowers with contact information for Goal, instead of Wilmington.

78.     Wilmington and Goal did not substantively respond to borrower requests for information about their loans and would not confirm that they had any records of the borrowers' loans.

79.     PHEAA's practice of referring borrowers to Wilmington and Goal caused immense confusion and frustration when consumers wasted their time trying to obtain information about their loan from Wilmington or Goal at PHEAA's direction.

80.     PHEAA was aware of the harm this practice was causing consumers because Wilmington explicitly instructed PHEAA to stop referring borrowers to it. By email in September 2020, an attorney for Wilmington—which is a wholly-owned subsidiary of M&T Bank—told PHEAA's outside counsel: "another NCSLT Borrower with unfortunate circumstances has gotten in contact with M&T only to be frustrated when there is nothing they can do for her.... Please tell your client to stop referring NCSLT borrowers to [Wilmington]/M&T...."

81.     Consumers also complained directly to PHEAA customer service representatives that they had wasted their time and were getting the run around when they contacted Wilmington at PHEAA's direction.

23

## FORBEARANCE FOR THE COVID-19 PANDEMIC

82.   After the President of the United States declared a national emergency for the COVID-19 pandemic beginning on March 1, 2020, PHEAA began to receive requests for payment relief from NCSLT borrowers impacted by COVID-19.

83.   On March 20, 2020, PHEAA sought guidance from Wilmington as to whether COVID-19 could be considered a natural disaster under the Servicing Guidelines, such that borrowers impacted by COVID-19 could be provided up to three months of natural disaster forbearance.

84.   Wilmington replied on March 23, 2020, that it had no authority to provide guidance on PHEAA's interpretation of the Servicing Guidelines. PHEAA did not receive any external guidance as to whether COVID could be considered a natural disaster.

85.   On March 27, 2020, PHEAA directed its employees that borrowers impacted by COVID could qualify for natural disaster forbearance.

86.   PHEAA denied at least 323 requests for COVID-related natural disaster forbearance on or before March 27, 2020. PHEAA did not timely respond to an additional at least 216 borrower requests for COVID-related natural disaster forbearance.

87.    On or after March 27, 2020, PHEAA began approving COVID-related natural disaster forbearance requests but did not undertake a lookback review that systematically corrected any injury to borrowers whose requests for forbearance might have been denied, or improperly recorded, prior to March 27, 2020.

88.    The Servicing Guidelines do not provide for an extension of natural disaster forbearance. Instead, the Servicing Guidelines dictate that a borrower seeking further payment relief after application of a three-month natural disaster forbearance is required to use hardship forbearance, if available.

89.    Despite this fact, when borrowers impacted by COVID-19 requested an extension of their forbearance, PHEAA told these borrowers it would ask the owners of their loans (the NCSLTs) for an extension of their natural disaster forbearance through an Exception Request, and they should expect a response within 7-10 business days. PHEAA did not inform these borrowers that the NCSLTs had not responded to Exception Requests since 2015.

90.    PHEAA customer service representatives often failed to inform these consumers whether they had any remaining payment relief options under the Servicing Guidelines—such as hardship forbearance or

temporary modified repayment—while they waited for a response from the NCSLTs to their requests for extension of natural disaster forbearance—a response PHEAA knew or should have known was not forthcoming.

91.    In some instances, PHEAA customer service representatives informed consumers of their other options for payment relief but encouraged consumers, either explicitly or implicitly, to wait on a response to the forbearance extension request, rather than applying for other relief options. In the meantime, these borrowers were left responsible for their full monthly payments once their three months of natural disaster forbearance expired.

92.    By the spring of 2020, the Trusts had not responded to any of the Exception Requests that PHEAA had sent to the Owner Trustee during the previous four-and-a-half years. Nevertheless, PHEAA created a list of borrowers seeking COVID-related forbearance extensions and contacted first Wilmington, and then Goal, for guidance. PHEAA effectively treated requests for extension of COVID-related forbearance as Exception Requests, but it did not send the individual COVID-related forbearance extension requests to Wilmington as it did with other Exception Requests.

93.    On July 21, 2020, Goal responded to PHEAA's request for guidance with a disclaimer that it "cannot provide direction to AES, or

provide a legal interpretation of the servicing guideline provisions[,]" but then followed with several arguments in favor of granting requests for extension of COVID-related natural disaster forbearance.

94.    In or about August 2020, having received no definitive direction or authority to extend COVID-related natural disaster forbearance, PHEAA decided to deny all NCSLT borrowers' COVID-related forbearance extension requests. But it took PHEAA an additional two to four months to convey this decision to most borrowers who were waiting for responses to their forbearance extension requests.

95.    On August 27, 2020, PHEAA provided guidance to employees instructing them that they could not extend COVID-related forbearances and Exception Requests should not be created for borrowers impacted by COVID-19 who asked for more forbearance time. PHEAA advised its employees to assess the requesting borrower for all other available options such as another repayment schedule or forbearance.

96.    In the first five months of the COVID-19 pandemic, PHEAA received approximately 5,082 requests for extension of COVID-related forbearance before it issued the August 27, 2020 guidance directing staff to stop accepting these requests. PHEAA denied the backlog of requests from

late August to December 2020, denying 3,111 forbearance extension requests in bulk on October 17, 2020.

97.    When PHEAA denied a request for COVID-related forbearance extension, it sent a letter to the borrower stating that the "Request to Extend Natural Disaster Forbearance…is no longer being offered for COVID-19 hardships. Other relief options may be available. Please contact us for assistance in regards to your COVID-19 hardship." Most borrowers were not sent this denial letter until between two and six months after their requests for forbearance extension.

98.    Prior to sending denial letters, PHEAA also sent 1,373 letters to borrowers while their requests for an extension of COVID-related forbearance were pending, which stated: "Please be advised that this exception request was forwarded to the owner of your student loan for a determination. As of today's date, the owner of your loan has not provided a response to this request." These two sentences were the entire content of the letters. These pending application letters did not inform borrowers that other relief options might be available, such as hardship forbearance or temporary modified repayment.

99.    In phone calls to PHEAA during June, July, and August 2020, borrowers grew increasingly frustrated when they received no response to

28

their requests for payment relief and were forced to call PHEAA to ask whether they had to make an upcoming loan payment. PHEAA failed to give these borrowers an answer before their initial forbearance ended and their payments came due. PHEAA deprived these borrowers of critical information necessary to make important personal financial decisions, including how to prioritize bills and necessities while these consumers were impacted by the pandemic.

## VIOLATIONS OF THE CONSUMER FINANCIAL PROTECTION ACT

100.  The CFPA provides that it is unlawful for any covered person "to offer or provide to a consumer any financial product or service not in conformity with Federal consumer financial law, or otherwise commit any act or omission in violation of a Federal consumer financial law." 12 U.S.C. § 5536(a)(1)(A). The CFPA grants the Bureau authority to commence a civil action against any person who violates a Federal consumer financial law, such as the CFPA. 12 U.S.C. § 5564(a).

101.  The CFPA prohibits a covered person from committing or engaging in any "unfair, deceptive, or abusive act or practice" in connection with any transaction with a consumer for a consumer financial product or service, or the offering of a consumer financial product or service. 12 U.S.C. §§ 5531, 5536(a)(1)(B).

29

## COUNT I—DECEPTIVE ACTS OR PRACTICES

## (Against PHEAA)

### *Misrepresenting that Exception Requests Would Be Answered*

102.   Plaintiff incorporates and realleges the allegations in Paragraphs 1–99.

103.   PHEAA's acts of accepting borrower requests, representing to borrowers that their request had been forwarded to their lender, and directing borrowers seeking to escalate their pending Exception Requests to contact Wilmington and Goal—combined with its failure to inform borrowers that the Trusts were not responding to Exception Requests— were likely to mislead reasonable borrowers. Borrowers were led to believe that they would eventually receive a substantive response to their Exception Requests from the Trusts and that efforts to make an Exception Request and contact Wilmington or Goal were not wastes of time.

104.   PHEAA's misrepresentations were material. Exception Requests were largely requests by borrowers and co-signers for some form of payment relief or release from the loan. A decision on a pending Exception Request implicated the amount borrowers would be obligated to pay toward their loans. Information concerning a consumer's payment obligation is material as it impacts the consumer's conduct in repaying their

loan.

105.   PHEAA therefore has engaged in deceptive acts or practices by misrepresenting to borrowers that their Exception Request would receive a substantive response in violation of the CFPA. 12 U.S.C. §§ 5531, 5536(a)(1)(B).

## COUNT II—DECEPTIVE ACTS OR PRACTICES

## (Against the NCSLTs)

### *Vicarious Liability for PHEAA's Misrepresentations that Exception Requests Would Be Answered*

106.   Plaintiff incorporates and realleges the allegations in Paragraphs 1–99.

107.   PHEAA made material misrepresentations and omissions regarding Exception Requests in its role as the Trusts' servicer and as the Trusts' agent that misled or were likely to mislead borrowers acting reasonably under the circumstances.

108.   PHEAA is an agent of the Trusts pursuant to the Servicing Agreement. In accordance with the terms of the Servicing Agreement, the Trusts do not interface directly with non-defaulted borrowers and instead contract with PHEAA as the servicer to interface directly with those borrowers on their behalf. The Servicing Agreement and the Servicing

Guidelines govern how PHEAA services loans held by the Trusts.

109.   PHEAA acted with actual or apparent authority from the Trusts in its handling of Exception Requests and communication to borrowers about those requests.

110.   As the Trusts' loan servicer, PHEAA was the known agent of the Trusts and had been cloaked with apparent authority to speak on behalf of the Trusts. Borrowers had no reason to doubt that PHEAA was acting within its authority to submit Exception Requests to the loan owner and provide contact information for Wilmington or Goal on behalf of the Trusts.

111.   The Trusts are liable for their agent PHEAA's material misrepresentations that were likely to mislead consumers to believe that their Exception Requests would receive a substantive response and that efforts to make an Exception Request and contact Wilmington or Goal were not wastes of time.

112.   Defendants therefore have engaged in deceptive acts or practices in violation of the CFPA by misrepresenting to borrowers that their Exception Request would receive a substantive response. 12 U.S.C. §§ 5531, 5536(a)(1)(B).

## COUNT III—UNFAIR ACTS OR PRACTICES

## (Against the NCSLTs)

### *Failing to Instate a Functioning Process for Deciding Exception Requests*

113.    Plaintiff incorporates and realleges the allegations in Paragraphs 1–99.

114.    Under section 1031 of the CFPA, an act or practice is unfair if it causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers, and such substantial injury is not outweighed by countervailing benefits to consumers or to competition. 12 U.S.C. §§ 5531(c), 5536(a)(1)(B).

115.    In October 2015, the Trusts, acting through the Owner Trustee, directed PHEAA to terminate the existing Exception Request process by which borrower requests for various forms of payment relief were processed and substantively answered.

116.    The Trusts' failure to instate a new Exception Request process was likely to cause substantial injury to borrowers as Exception Requests for various forms of relief, including payment relief, went unanswered for several years. Borrowers were harmed when they were required to expend time and energy to follow-up with PHEAA, and in some instances Goal and Wilmington, concerning the status of their pending Exception Requests.

Borrowers were also injured by the resulting uncertainty and inability to plan financially or make informed financial decisions.

117.   Some consumers suffered further consequential harms when they did not get relief for which they were eligible, such as co-signers who remained liable for student loan obligations even though they were eligible for release from the debt under the Servicing Guidelines and servicemembers on active duty who did not have the SCRA interest cap applied to their loans, and thus were charged excessive, unlawful interest.

118.   The injury to borrowers was unavoidable because borrowers had no control over whether the Trusts had a functioning process to respond to Exception Requests and were not aware that Exception Requests were not being decided.

119.   The injury to borrowers is not outweighed by countervailing benefits to consumers or to competition.

120.   Therefore, the Trusts' acts or practices constitute unfair acts or practices in violation of sections 1031 and 1036 of the CFPA. 12 U.S.C. §§ 5531, 5536(a)(1)(B).

## COUNT IV—UNFAIR ACTS OR PRACTICES

## (Against PHEAA)

### *Failing to Grant Natural Disaster Forbearance for COVID-19*

121.   Plaintiff incorporates and realleges the allegations in Paragraphs 1–99.

122.   PHEAA's denial of, or failure to timely respond to, eligible borrower requests for COVID-related natural disaster forbearance was likely to cause substantial injury to borrowers because it required them to make payments, or become delinquent on their loans, when they should have been entitled to a payment pause.

123.   This injury was not reasonably avoidable by consumers because borrowers who were eligible for COVID-related natural disaster forbearance under the Servicing Guidelines were not aware of their eligibility or that their request for COVID-related natural disaster forbearance had been improperly denied or delayed in receiving approval.

124.   This injury is not outweighed by countervailing benefits to consumers or to competition.

125.   Therefore, PHEAA's denial of, or failure to timely respond to, COVID-related natural disaster forbearance constitutes unfair acts or practices in violation of the CFPA. 12 U.S.C. §§ 5531, 5536(a)(1)(B).

## COUNT V—UNFAIR ACTS OR PRACTICES

## (Against PHEAA)

### *Failing to Inform Borrowers Seeking COVID-19 Forbearance Extensions of their Payment Relief Options and that the NCSLTs Did Not Have a Functioning Exception Request Process*

126.   Plaintiff incorporates and realleges the allegations in

Paragraphs 1–99.

127.   PHEAA's failure to inform borrowers seeking an extension of

COVID-related forbearance that the NCSLTs did not have a functioning

Exception Request process, and failure to inform borrowers whether they

had other payment relief options available, was likely to cause substantial

injury to consumers.

128.   Consumers who were eligible for other forms of payment relief,

such as hardship forbearance, likely suffered substantial injury when they

did not get the payment relief for which they were eligible. They were

required to make payments they could not afford, or become delinquent on

their loans, when they should have been entitled to a payment pause.

Borrowers were also harmed when they were required to expend time and

energy to follow-up with PHEAA concerning the status of their pending

request for a forbearance extension. And borrowers were likely injured by

the resulting uncertainty and inability to plan financially or make informed

financial decisions while they were impacted by the pandemic.

129.   This injury was not reasonably avoidable as borrowers were not aware that the Servicing Guidelines might provide other forms of payment relief such as hardship forbearance or temporary modified repayment. Borrowers also did not know that the Trusts had not responded to Exception Requests since 2015.

130.   This substantial injury was not outweighed by countervailing benefits to consumers or to competition.

131.    Therefore, PHEAA's failure to assess borrowers seeking an extension of COVID-related forbearance for all payment relief options, and failure to inform these borrowers that the NCSLTs did not have a functioning process to respond to their Exception Requests, constitute unfair acts or practices in violation of sections 1031 and 1036 of the CFPA. 12 U.S.C. §§ 5531, 5536(a)(1)(B).

## **THIS COURT'S POWER TO GRANT RELIEF**

132.   The CFPA empowers this Court to grant any appropriate legal or equitable relief including, without limitation, a permanent or temporary injunction, rescission or reformation of contracts, the refund of moneys paid, restitution, disgorgement or compensation for unjust enrichment, payments of damages or other monetary relief, limits on the activities or

functions of Defendants, and civil money penalties. 12 U.S.C. § 5565(a)(2). In addition, the CFPB may recover its costs in connection with the action, if it is the prevailing party. 12 U.S.C. § 5565(b).

## DEMAND FOR RELIEF

133.    Wherefore, the Bureau requests that the Court:

a.    Permanently enjoin Defendants from committing future violations of the CFPA;

b.    Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the CFPA, including, but not limited to:

    i. Retrospective injunctive relief;

    ii. Rescission or reformation of contracts, the refund of moneys paid, restitution, disgorgement or compensation for unjust enrichment, and payment of damages or other monetary relief;

c.    Award the Bureau civil money penalties; and

d.    Award the Bureau the costs of bringing this action, as well as such other and additional relief as the Court may determine to be just and proper.

Dated: May 6, 2024

Respectfully submitted,

Eric Halperin
*Enforcement Director*

Deborah Morris
*Deputy Enforcement Director*

Michael P. Favretto
*Assistant Deputy Enforcement Director*


___/s/ Adrienne Warrell_____
Adrienne Warrell (NY 5361092)
202-435-7189
Adrienne.Warrell@cfpb.gov

Gabriel Hopkins (NY 5242300)
202-435-7842
Gabriel.Hopkins@cfpb.gov

Tiffany Hardy (NY 4074142)
202-435-9375
Tiffany.Hardy@cfpb.gov

*Enforcement Attorneys*

1700 G Street NW
Washington, DC 20552
Facsimile: (202) 435-7722

Attorneys for the Consumer Financial
Protection Bureau