**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU, | : : : | Civil No. 1:24-CV-756 |
| Plaintiff, | : : | |
| v. | : : | |
| PENNSYLVANIA HIGHER EDUCATION ASSISTANCE AGENCY, *et al.*, | : : : | |
| Defendants. | | Judge Jennifer P. Wilson |

<u>**MEMORANDUM**</u>

Before the court is the joint motion for judgment and entry of stipulated

orders, Doc. 3, filed by Plaintiff Consumer Financial Protection Bureau ("CFPB")

and Defendants Pennsylvania Higher Education Assistance Agency ("PHEAA")

and National Collegiate Student Loan Trusts (" the Trusts")[1], as well as objections,

Doc. 33, filed by intervenor Pacific Investment Management Company LLC

---

[1] For brevity, the court will refer to these fifteen Defendants as Defendant Trusts.  Defendant Trusts are fifteen trusts that "acquire and hold pools of private student loans, collect on and provide for the servicing of those loans, and issue interest-bearing securities to investors backed by proceeds from student loan payments." (Doc. 1, ¶ 17.)  The fifteen trusts are the National Collegiate Master Student Loan Trust I, the National Collegiate Student Loan Trust 2003-1, the National Collegiate Student Loan Trust 2004-1, the National Collegiate Student Loan Trust, 2004-2, the National Collegiate Student Loan Trust 2005-1, the National Collegiate Student Loan Trust 2005-2, the National Collegiate Student Loan Trust 2005-3, the National Collegiate Student Loan Trust 2006-1, the National Collegiate Student Loan Trust 2006-2, the National Collegiate Student Loan Trust 2006-3, the National Collegiate Student Loan Trust 2006-4, the National Collegiate Student Loan Trust 2007-1, the National Collegiate Student Loan Trust 2007-2, the National Collegiate Student Loan Trust 2007-3, and the National Collegiate Student Loan Trust 2007-4

("PIMCO").[2]  The joint motion for judgment asks the court to enter two proposed judgments, one as to and PHEAA and the other as to the Trusts, that would generally require PHEAA and the Trusts to implement adequate servicing policies, pay monetary redress to affected borrowers and civil monetary penalties, and submit to oversight by the CFPB.  (Docs. 3-1, 3-2.)  PIMCO, who manages funds held by noteholders of the Trusts, argues that the proposed judgment relating to the Trusts was agreed to without the proper authority, violates the noteholders' contractual rights, and is not fair and reasonable.  (Doc. 33.)  For the reasons that follow, PIMCO's objections will be overruled and the joint motion for judgment will be granted.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Defendant Trusts are "business entities that acquire and hold pools of private student loans, collect on and provide for the servicing of those loans, and issue interest-bearing securities to investors backed by proceeds from student loan payments."  (Doc. 1, ¶ 2.)  Defendant PHEAA is a student loan servicer and has been the primary servicer for the Trusts since 2006.  (*Id.* ¶ 3.)  "PHEAA interacts with the borrowers on the Trusts' behalf[, including] accepting loan payments and accepting and responding to borrower requests, such as requests for reduced

---

[2] The court granted PIMCO's motion to intervene by separate order, allowing PIMCO to intervene for the purpose of raising objections to the joint motion for judgment.  (Doc. 46.)

payment amounts, forbearance, or deferment." (*Id.*) The Trusts' governance and relationship to Noteholders (like PIMCO) and servicers (like PHEAA) are governed by various documents, collectively referred to as the Trust Related Agreements. (Doc. 33, p. 9.)[3] These agreements are: the Trust Agreement, the Indenture, the Administration Agreement, and the Servicing Agreement.[4] (*Id.*)

The organizational structure of the Trusts has been the subject of prior litigation and has been helpfully explained by the Court of Chancery of Delaware in *In re National Collegiate Student Loan Trusts Litigation*, 251 A.3d 116 (Del. Ch. 2020) ("*NCSLT Governance Dispute*"). As explained by the Chancery Court, the Trusts' purpose is to "(i) acquir[e] Student Loans by issuing certain Notes, (ii) execut[e] the Indenture and (iii) fulfill[] loan servicing obligations[.]" *Id.* at 131. The Trusts have no officers or employees, and therefore, act through the Owner Trustee. *Id.* This structure is established by the Trust Agreement. *Id.* at 132.

The Trusts executed the Indenture, which grants to the Indenture Trustee "the Trusts' interest in a list of assets and related contractual rights, defined as the 'Collateral[.]'" *Id.* at 134. The grant of the Collateral "'is made in trust to secure

---

[3] For ease of reference, the court will use the page numbers contained in the CM/ECF header.

[4] These agreements are located in various locations on the docket. Because PIMCO is the objecting party, the court will use the docket numbers that PIMCO uses, which are as exhibits attached to Attorney Rodman's declaration. The Trust Agreement is Doc. 34-1, the Indenture is Doc. 34-2, the Administration Agreement is Doc. 34-3, and the Servicing Agreement is Doc. 34-4.

the payment of principal of and/or interest on . . . Notes' and 'to secure compliance with the provisions of this Indenture.'" *Id.* (quoting the Indenture, Doc. 34-2, p. 8.) Until the Indenture is discharged, "the Trusts are prohibited from 'engaging in any business' other than the acquisition, collection and transfer of student loans, and 'all [of] the [Trusts'] right, title and interest in' the Student Loans remains in the Indenture Trust Estate . . . subject to the control of the Indenture Trustee." *Id.* at 136. As previously stated, PIMCO manages funds which hold Class A notes issued by five of the Trusts, with "an original balance of approximately $212,227,000." (Doc. 33, p. 14.) Under the agreements, noteholders are third-party beneficiaries of the Trust Related Agreements. (*Id.*; *see also NCSLT Governance Dispute*, 251 A.3d at 196–97.)

There are a few key players that are involved in the governance of the Trusts and a brief description of each of their functions will be helpful. As previously mentioned, the Trusts can take direct action only through the Owner Trustee. (Doc. 34-2, pp. 8, 11–12; Trust Agreement §§ 1.01, 2.01.) The Owner Trustee is Wilmington Trust Company, and, largely, the Trust Agreement governs the Owner Trustee's behavior. (*Id.*) There is also an Administrator, who "perform[s] . . . its duties and obligations and the duties and obligations of the Owner Trustee on behalf of the Issuer under the Indenture and the Trust Agreement[.]" (Doc. 34-3, p. 3; Administration Agreement § 1(a)(c)(i).) The administrator is GSS Data

Services, Inc., and its behavior is largely governed by the Administration

Agreement.[5]  The Administrator entered into Servicing Agreements with Servicers,

such as Defendant PHEAA, in order for PHEAA to do the day-to-day servicing of

the student loans in accordance with the Servicing Agreement.  (Doc. 34-4, p. 2;

Servicing Agreement Section 2.)

　　　The Indenture Trustee is the trustee of the Indenture Estate,[6] and holds for

the benefit of the noteholders the "right, title and interest in . . . the Financed

Student Loans[.]"  (Doc. 34-2, p. 8; Indenture Granting Clause.)  The Indenture

outlines the Indenture Trustee's duties and obligations.  The Indenture Trustee is

U.S. National Bank Association.  (Doc. 34-2, p. 67; Indenture Appendix A.)  The

noteholders hold notes issued by the Trusts.  (Doc. 34-2, p. 69; Indenture Appendix

A.)

　　　With this background in mind, the court now turns to the allegations in the

complaint. The CFPB filed the instant complaint on May 6, 2024, alleging,

generally, that "[f]or years, the Trusts failed to respond to borrowers' requests for

payment relief, and PHEAA failed to give accurate and useable information to

---

[5] The first Administrator was First Marblehead Data Services, Inc.  (Doc. 34-2, p. 2;
Administration Agreement Preamble.)  GSS Data Services, Inc. is the current Administrator.

[6] More specifically, the "'Indenture Trust Estate' means all money, instruments, rights and other
property that are subject or intended to be subject to the lien and security interest of the Indenture
for the benefit of the Noteholders (including all property and interests granted to the Indenture
Trustee), including all proceeds thereof."  (Doc. 34-2, p. 67; Indenture Appendix A.)

borrowers seeking help." (Doc. 1, ¶ 1.) These requests "generally involve[d] some form of borrower payment relief such as requests for a co-signer release, extension of forbearance or deferment beyond the time permitted in the Servicing Guidelines, settlement, loan forgiveness, Servicemember Civil Relief Act ("SCRA") benefits" and others. (*Id.* ¶ 31.) Per the complaint, prior to 2015, PHEAA and the Trusts had a system for resolving "exception requests" such as "requests to release co-signers from loans, extend forbearances, or compromise or settle outstanding loan balances" in which "PHEAA forwarded such requests to certain other NCSLT-related entities for decision[.]" (*Id.* ¶¶ 5, 6.) However, around 2015, stakeholders of the Trusts began disputing the Trusts' governance and management, leading to a total breakdown in the process for deciding exception requests and, as a result, "[f]rom 2015 to 2021, thousands of borrower Exception Requests for various forms of payment relief went unanswered." (*Id.* ¶ 7.) During this time period, while the process for deciding exception requests was not functioning, "PHEAA gave borrowers the misleading impression that their Exception requests would receive a substantive response from the NCSLTs, despite knowing they would not." (*Id.* ¶ 8.)

An illustrative example of the acts and practices alleged by the CFPB is PHEAA and the Trusts' handling of forbearance requests during the COVID-19 pandemic. In March 2020, "PHEAA sought guidance from Wilmington [Owner

Trustee] as to whether COVID-19 could be considered a natural disaster under the Servicing Guidelines, such that borrowers impacted by COVID-19 could be provided up to three months of natural disaster forbearance." (*Id.* ¶ 83.) Wilmington responded that "it had no authority to provide guidance on PHEAA's interpretation of the Servicing Guidelines." (*Id.* ¶ 84.) During the period when PHEAA was awaiting Wilmington's response, it "denied at least 323 requests for COVID-related natural disaster forbearance" and "did not timely respond to an additional at least 216 borrower requests for COVID-related natural disaster forbearance." (*Id.* ¶ 86.) In late March 2020, PHEAA decided that COVID-19 did qualify as a natural disaster, but upon beginning to approve such requests, PHEAA "did not undertake a lookback review that systematically corrected any injury to borrowers whose requests for forbearance might have been denied[.]" (*Id.* ¶¶ 85, 87.)

Similarly, although the Servicing Guidelines do not provide for natural disaster forbearance extensions, PHEAA told borrowers who requested this option that "it would ask the owners of their loans (the NCSLTs) for an extension of their natural disaster forbearance through an Exception Request, and they should expect a response within 7-10 business days." (*Id.* ¶ 89.) PHEAA failed to "inform these borrowers that the NCSLTs had not responded to Exception Requests since 2015." (*Id.*) PHEAA requested guidance on COVID-related forbearance extension

requests in the spring of 2020, but did not receive any response until July 2020, at which time the Administrator responded that it could not provide any direction to PHEAA on the legal interpretation of the Servicing Guidelines. (*Id.* ¶¶ 92, 93.) Thereafter, in August 2020, "PHEAA decided to deny all NCSLT borrowers' COVID-related forbearance extension requests. [And] it took PHEAA an additional two to four months to convey this decision to most borrowers who were waiting for responses to their forbearance extension requests." (*Id.* ¶ 94.)

In its complaint, the CFPB alleges one count of deceptive acts or practices against PHEAA for misrepresenting that requests would be answered, one count of deceptive acts or practices against the Trusts based on vicarious liability for PHEAA's misrepresentations to borrowers, one count of unfair acts or practices against the Trusts for failing to have a functioning process for deciding exception requests, one count of unfair acts or practices against PHEAA for failing to grant natural disaster forbearance for COVID-19, and one count of unfair acts or practices against PHEA for failing to inform borrowers seeking COVID-19 forbearance of their payment options and for not having a functioning process for exception requests. (*Id.* ¶¶ 103–131.)

The same day that the CFPB filed its complaint, the parties also filed the instant joint motion for judgment along with two proposed stipulated final judgments and orders, one for PHEAA and one for the Trusts, that would resolve

this case.  (Docs. 3, 3-1, 3-2.)[7]  The proposed judgment relating to the Trusts

requires four broad categories of actions from the Trusts.  First, the Trusts must

take steps to implement the servicing guidelines agreed to as part of the settlement,

which generally institute processes and timelines for deciding exception requests.

(Doc. 3-2, ¶¶7–12.)  Second, the proposed judgment requires the Trusts and

PHEAA to set aside $2,886,817, in accordance with a separate cost allocation plan,

in order to pay redress to affected borrowers, as well as a statutory monetary

penalty of $400,000 to the CFPB, split between all Defendants.  (*Id.* ¶¶ 16, 44.)

Third, the proposed judgment requires that Defendants formulate a plan for

reviewing and identifying potentially affected borrowers that may deserve redress.

(*Id.* ¶¶ 18–43.)  Fourth and finally, the Trusts must submit their plans to modify

servicing guidelines and the redress plan to the CFPB for review as well as report

to the CFPB for five years after the implementation of the proposed judgment.  (*Id.*

¶¶9, 13, 54–68.)

Also on May 6, 2024, the Trusts filed a response to the joint motion for

judgment requesting that the court "not decide the [joint motion for judgment] until

after noteholders in the Trusts' debt securities have an opportunity to present to the

Court any objection to the Proposed Stipulated Judgment."  (Doc. 7, p. 2.)  The

response was accompanied by a proposed notice to noteholders as well as a

---

[7] The court will refer to these documents as the "proposed judgments" throughout this order.

proposed order establishing a timeline for when objections must be submitted to the court.  (Docs. 7-1, 7-2.)  The court entered the proposed order the same day, establishing the following deadlines: objections to the proposed judgment must be filed by May 24, 2024, and responses to any objections must be filed by May 29, 2024.  (Doc. 13.)

On May 24, 2024, PIMCO filed a motion for extension of time to file objections, and other non-party noteholders[8] filed a motion to join PIMCO's motion.  (Docs. 21, 22).  The court granted these motions on June 3, 2024, extending the deadline for objections to June 21, 2024, and the deadline for response to June 28, 2024.  (Doc. 28.)  On June 21, 2024, only PIMCO filed objections to the proposed judgment as it relates to the Trusts.[9]  (Doc. 33.)  On June 28, 2024, both the Trusts and the CFPB responded to the objections.  (Docs. 36, 37.)  On July 19, 2024, with leave of court, PIMCO filed a reply brief in support of its objections.  (Doc. 41.)  As of July 19, 2024, the motion was ripe and ready for review.

---

[8] The non-party noteholder group consists of Waterfall Eden Master Fund, Ltd., Waterfall Delta Offshore Master Fund, LP., Waterfall Sandstone Fund, LP., Baldr Sherwood Fund, Inc., One William Street Capital Master Fund, Ltc., OWS ABS Master Fund II, L.P., OWS COF I Master, L.P., OWS Credit Opportunity I, LLC, OWS Fixed Income Fund (USD-Hedged), Ltd., LibreMax Master Fund, Ltd., LibreMax Value Master Fund, Ltd., LibreMax MSW Fund, Ltd., AG Mortgage Value Partners Master Fund, L.P., AG Pisgah, L.P., and AG Super RMBS LLC. (Doc. 22, pp. 1, 2.)

[9] There have been no objections regarding the proposed consent judgment relating to PHEAA.

On September 13, 2024, the Trusts filed a motion for leave to file the

Owners' views on the proposed settlement.  (Doc. 43.)  On September 16, 2024,

the court granted the motion and allowed PIMCO to respond by September 23,

2024.  (Doc. 44.)  PIMCO responded on September 23, 2024.  (Doc. 47.)

Accordingly, because PIMCO has had the opportunity to respond to this filing, the

court will consider it in reviewing the objections and the motion for proposed

judgment.

## JURISDICTION AND VENUE

This court has jurisdiction under 28 U.S.C. § 1331 because this action is

brought under federal law, specifically the Consumer Financial Protection Act, 12

U.S.C. § 5565(a)(1).  Venue is appropriate under 12 U.S.C. § 5564(f) because

PHEAA has a principal place of business within the Middle District of

Pennsylvania and the Trusts do business within the Middle District.

## STANDARD OF REVIEW

A consent decree has the attributes of both a contract and a judgment.

*Phoenix Resources, Inc. v. Duncan Twp.*, 155 F.R.D 507, 509 (M.D. Pa. 1994).

First, "[i]t is an agreement between the parties reached through mutual consent,

and so has the attributes of a contract."  *Id.*  Second, it is also a judgment, serving

"as res judicata, barring either party from bringing a separate lawsuit[.]"  *Id.*  Thus,

it is essentially "a settlement agreement subject to continued judicial policing."  *Id.*

In reviewing a consent decree, "the district court must be satisfied that it is fair, adequate, and reasonable." *Id.* at 509–10.  In undertaking this review, the court is afforded "considerable discretion."  *Id.* at 510.

Because a consent decree has attributes of a judgment, "a consent decree must spring from and serve to resolve a dispute within the court's subject-matter jurisdiction."  *Local No. 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland*, 478 U.S. 501, 525 (1986).  Additionally, " the consent decree must 'com[e] within the general scope of the case made by the pleadings,' and must further the objectives of the law upon which the complaint was based."  *Id.* (quoting *Pacific R. Co. v. Ketchum,* 101 U.S. 289, 297 (1880)).

Further, because a consent decree also has attributes of a contract, "the parties' consent animates the legal force of a consent decree.  Therefore, a federal court is not necessarily barred from entering a consent decree merely because the decree provides broader relief than the court could have awarded after a trial."  *City of Cleveland*, 478 U.S. at 525.  However, "[t]his is not to say that the parties may agree to take action that conflicts with or violates the statute upon which the complaint was based."  *Id.* at 526.

Overall, "a consent decree is primarily a means by which parties settle their disputes without having to bear the financial and other costs of litigating."  *Id.* at 528.  Because a consent decree is, essentially, a contract between two parties, the

12

role of a third party or intervenor is limited, such that a third party or intervenor "does not have power to block the decree merely by withholding its consent." *Id.* at 529. However, "an intervenor is entitled to present evidence and have its objections heard[.]" *Id.* at 528. The parties to the consent decree "may not dispose of the claims of a third party, and *a fortiori* may not impose duties or obligations on a third party, without that party's agreement." *Id.* at 529. Thus, "a court's approval of a consent decree between some of the parties therefore cannot dispose of the valid claims of nonconsenting intervenors; if properly raised, these claims remain and may be litigated by the intervenor." *Id.* Finally, "a court may not enter a consent decree that imposes obligations on a party that did not consent to the decree." *Id.*

## DISCUSSION

The court must review this proposed judgment and be satisfied that it is fair and reasonable. Further, the court also notes that PIMCO, on behalf of noteholders, is a third party to the instant proposed judgment. Accordingly, the fact that PIMCO objects to this judgment, in and of itself, does not preclude the court's approval of the judgment. *City of Cleveland*, 478 U.S. at 529. Rather, the court will analyze each objection on the merits, and determine whether the consent decree disposes of any claims the noteholders may have or imposes obligations on the noteholders, as well as whether the objection shows that the consent decree is

not fair or reasonable.  *Id.*  The court now turns to each objection and the parties'
arguments.

### A. Authority to Enter into Proposed Judgment

PIMCO has two theories supporting their objection based on the Trusts'
authority to enter into the proposed judgment.  First, PIMCO argues "there is no
evidence that WilmerHale is authorized to enter into the proposed consent
judgment on behalf of the Trusts."  (Doc. 33, p. 18.)  According to PIMCO, "'the
business affairs of a statutory trust shall be managed by or under the direction of its
Trustee[,]'" and here, that is the Owner Trustee.  (*Id.*) (quoting *NCSLT
Governance Dispute*, 251 A.3d 116, 170 (Del. Ch. 2020)).  However, "there is no
indication that the Owner Trustee is acting on behalf of the Trusts here" because it
is not a party, it did not ask the court for entry of the proposed judgment, and
"there does not appear to be written authorization from the Owner Trustee
instructing Trust counsel to execute the Proposed Consent Judgment."  (*Id.* at 18,
19.)

In support of the first theory, PIMCO points to *Consumer Fin. Protection
Bureau v. Nat'l Collegiate Student Loan Master Trust*, No. 17-1323, 2020 WL
2915759 (D. Del. May 31, 2020) ("*CFPB I*"), wherein the District of Delaware
rejected a proposed consent judgment after discovery "established that the Owners
had directed Trust counsel to execute the settlement without authority from the

Owner Trustee." *Id.* at *3, *5.  PIMCO argues the same is true here where it has

not been established who engaged the law firm of WilmerHale, "who directs

WilmerHale . . . ; what responsibilities of the Owner Trustee were delegated to

WilmerHale and under what authority; and how WilmerHale is authorized under

the Trust Related Agreements to bind the Trusts to a federal consent judgment."

(Doc. 33, p. 20.)

Second, PIMCO argues that even if the Owner Trustee properly authorized

the instant proposed judgment, it did not do so in accordance with the Trust

Related Agreements, which, according to PIMCO, require the Owner Trustee to

receive written approval from all owners prior to compromising a lawsuit brought

against the Trusts.  (*Id.*) (citing Trust Agreement § 4.01; Doc. 34-1, p. 15.)

PIMCO argues that the Owner Trustee did not obtain the Owners' written approval

because none has been provided to PIMCO, but rather, "the Owner Trustee merely

requested 'instructions' from the Owners . . . on whether to execute certain

documents relating to the Proposed Consent Judgment–not whether to enter into

the Proposed Consent Judgment itself."  (*Id.* at 21.)

The Trusts respond that the Trusts have been authorized to enter into the

settlement because "the Administrator retained WilmerHale on behalf of the Trusts

at the Owner Trustee's and Indenture Trustee's direction."  (Doc. 36, p. 18.)  The

Trusts agree that the Owner Trustee is the only entity that can act on behalf of the

15

Trusts, but also notes that the Owner Trustee can delegate that authority.  (*Id.*) (citing *NCSLT Governance Dispute*, 251 A.3d at 169–71.)  The Trusts argue that the Owner Trustee can delegate its authority to the Administrator, but with the limitation that the "the Administrator 'shall not' take any action as to non-ministerial matters, including the settlement of actions brought against the Trusts, 'unless the Administrator shall have received instructions from the Indenture Trustee, in accordance with the Indenture, from the Owner Trustee or the Owners, in accordance with the Trust Agreement."  (*Id.*) (citing Administration Agreement § 1(d)(i); Doc. 34-3, p. 4.)  Here, the Owner Trustee directed the Administrator to retain WilmerHale to represent the Trusts in this action.  (*Id.* at 18, 19; Doc. 36-1.)[10]

The Trusts also argue that every entity required to approve the proposed settlement under the Trust Agreements has done so.  (*Id.* at 19.)  The Trusts recognize that the Owner Trustee is the only entity able to act directly on behalf of the Trusts and may not settle non-ministerial matters without written approval from the Owners.  (*Id.*)  However, the Trusts point to a separate section of the Trust Agreement, which provides that:

---

[10] The instructions direct the Administrator to retain WilmerHale to represent each yearly Trust and the Master Trust "in related discussions with, and written submissions to, the CFPB with respect to this matter, and in any resulting proceeding(s) brought by the CFPB against the [Trusts.]" (Doc. 36-1.)

> In the event that the Owner Trustee is unable to decide between alternative courses of action . . . , the Owner Trustee may give notice . . . to the Owners requesting instructions[.]  If the Owner Trustee shall not have received appropriate instructions . . . the Owner Trustee may, but shall be under no duty to, take or refrain from taking such action, not inconsistent with this Agreement or the Trust Related Agreements, as the Owner Trustee shall deem to be in the best interests of the Owners[.]

(Trust Agreement, § 8.06; Doc. 34-1, p. 22.)  The Trusts then point to an email exchange attached to its brief in which "the Owner Trustee emailed the Owners, requesting that the Owners issue any instruction regarding entry into the proposed Settlement by 5:00 pm ET on May 3, 2024.  The Owners' counsel stated that the Owners would not be issuing instructions prior to the deadline[,]" and the Note Insurer consented as to the master Trust.  (Docs. 36, p. 20; 36-1.)  Further, on September 16, 2024, the Trusts filed a letter from the Owners specifically stating that the Owners do not object to the entry of the proposed judgment.  (Doc. 45, p. 5.)  In addition, the Trusts argue "the Owner Trustee is not the only party who can direct the Trusts or parties' in the Trusts' governance structure to settle claims against the Trusts" because the Trust Agreements also provide authority to the Administrator and the Indenture Trustee to "negotiate and settle [lawsuits] at the expense of the Trusts."  (Doc. 36, p. 21) (citing *NCSLT Governance Dispute*, 251 A.3d at 140, 146–47, 168; *see also* Administration Agreement §§ 1(a); Indenture Granting Clause.)  Finally, the Trusts argue that "[t]here is no requirement in the Trust Related Agreements or elsewhere that those parties themselves be named in

17

this action, and PIMCO does not point to any authority suggesting otherwise."
(*Id.*)

The CFPB adds that the Owner Trustee, the Indenture Trustee, and the
Administrator executed signatures on copies of the cost allocation agreement and
the May 1, 2024 Servicing Guidelines Amendment, which "demonstrate[s] those
entities' consent for the NCSLT Proposed Order." (Doc. 37, pp. 9, 10; Docs. 37-1,
37-2.)  The CFPB reiterates the arguments made by the Trusts regarding the Owner
Trustee obtaining consent through Trust Agreement § 8.06 and the authority of the
Indenture Trustee and Administrator to compromise claims against the Trusts.
(Doc. 37. pp. 10, 11.)  The CFPB further notes that the Chancery Court held that
"if the claims asserted against the Trusts relate to the Collateral, the Indenture
Trustee may settle the legal action directly on behalf of the Trusts." (*Id.* at 12)
(quoting *NCSLT Governance Dispute*, 251 A.3d at 146.)  Thus, the CFPB contends
the Trusts were authorized to enter into the settlement agreement because the
Indenture Trustee, Administrator, and Owner Trustee with consent of the Owners
signed off on it.

In reply, PIMCO argues that the Trusts read § 8.06 to require "the Owners to
take action to stop the Owner Trustee from compromising a claim" rather than
requiring prior written approval. (Doc. 41, p. 4.)  Further, PIMCO argues that
§ 8.06 authorizes the Owner Trustee to take actions in the absence of approval

18

from the Owners, but those actions must be consistent with the Trust Related Agreements.  (*Id.*)  PIMCO does not explain how the proposed consent judgment is inconsistent with the Trust Related Agreements, but presumably relies upon its arguments that the proposed judgment violates the provisions of the Trust Agreements.  PIMCO argues that "even if the Indenture Trustee could authorize the Trusts to compromise claims," its authority would mirror the authority delegated to it from the Owner Trustee and would require written approval by the Owners, which did not occur here.  (*Id.* at 5.)

Finally, PIMCO argues that the Trusts have provided no evidence that they were authorized to enter into the proposed judgment because neither the Owner Trustee nor Administrator entered into the judgment on behalf of the Trusts, and there are no instructions to enter into a settlement other than the instructions to retain WilmerHale to represent the Trusts during this litigation.  (*Id.* at 6, 7.)

Two different provisions of the Trust Related Agreements are at issue here. First, PIMCO points to § 4.01(b) of the Trust Agreement, which provides:

> Without limiting the generality of the foregoing, in connection with the following nonministerial matters, the Owner Trustee will take no action, and will not have authority to take any such action, unless it receives prior written approval from all the Owners for so long as any of the Notes are outstanding: (i) Initiate any claim or lawsuit by the Trust and compromise any claim or lawsuit brought by or against the Trust[.]

(Doc. 34-1, p. 15; Trust Agreement § 4.01(b)).  This provision lays out the requirements necessary for the Owner Trustee to compromise lawsuits brought against the Trust: the Owner Trustee must receive "prior written approval" from all of the Owners.

On the other hand, Trusts and the CFPB point to Administration Agreement § 1(d)(i), which provides:

> With respect to matters that in the reasonable judgment of the Administrator are non-ministerial, the Administrator shall not be under any obligation to take any action, *and in any event shall not take any action unless the Administrator shall have received instructions from the Indenture Trustee, in accordance with the Indenture, from the Owner Trustee or the Owners, in accordance with the Trust Agreement.* For the purpose of the preceding sentence, "non-ministerial matters" shall include, without limitation: (A) The amendment of or any supplement to the Trust Related Agreements; (B) The initiation of any claim or lawsuit by the Issuer and the compromise of any action, claim or lawsuit brought by or against the Issuer, except for claims or lawsuits initiated in the ordinary course of business by the Issuer or their respective agents or nominees for the collection of the Student Loans owned by the Issuer [.]

(Doc. 34-3, p. 4; Administration Agreement § 1(d)(i) (emphasis added).)  Although no party mentions this, at first blush, this provision is unclear as to who is required to instruct the Administrator when the Administrator seeks to settle nonministerial claims: is it the Indenture Trustee or the Owner Trustee or the Owners who must direct the Administrator to settle claims?  And, may it be just one of those parties, or must it be all?  There appears to be a missing conjunction in the highlighted text.

However, the Court of Chancery of Delaware interpreted these two provisions and noted that "non-ordinary course claims would trigger the sometimes-confusing reality that *both* the Indenture Trustee and the Owners may direct the Administrator and the Trusts–setting up the potential for conflicting instructions." *NCSLT Governance Dispute*, 251 A.3d at 146.  In that case, the court, in interpreting the same provision, held that the "[a]dministrator can receive non-ministerial direction from either 'the Indenture Trustee, in accordance with the Indenture, or from the Owner Trustee or the Owners, in accordance with the Trust Agreement[.]" *Id.* at 146 n.133.  As that court noted:

> On the one hand, the Indenture Trustee would have two options when the Administrator is confronted with non-ministerial claims.  First, if the claims asserted against the Trusts relate to the Collateral, the Indenture Trustee may settle the legal action directly on behalf of the Trusts.  This right allows the Indenture Trustee to protect the Noteholders' and AMBAC's beneficial interest. Alternatively (and consistent with its passive role), the Indenture Trustee could direct the Administrator to negotiate and settle the lawsuit at the expense of the Trusts. If the Administrator received this direction from the Indenture Trustee, it would be authorized to act accordingly.

*Id.* at 146–47.  Moreover, the Chancery Court noted that "the Owners lack authority to direct the Owner Trustee to act on behalf of the Trusts *unless* the Owner direction arises out of a Trust obligation.  The Owners, therefore, could not direct the Owner Trustee to settle non-ordinary course litigation unless the Trusts had a contractual obligation to do so." *Id.* at 147.  Consistent with the above interpretation by the Delaware Chancery Court, the Administration Agreement

requires the Administrator to receive instruction *either* from the Indenture Trustee, in accordance with the Indenture, *or* from the Owner Trustee or Owners, in accordance with the Trust Agreement.

Here, the Trusts and the CFPB have shown that the Owner Trustee and Indenture Trustee instructed the Administrator to retain the law firm of WilmerHale to represent each yearly Trust and the Master Trust "in related discussions with, and written submissions to, the CFPB with respect to this matter, and in any resulting proceeding(s) brought by the CFPB against the [Trusts.]" (Doc. 36-1.)  The administrator followed the instructions and retained WilmerHale on October 31, 2022.  (*Id.* at 3.)  WilmerHale then began negotiating with the CFPB and "regularly sought the input of various of the parties to the Trust Related Agreements, including the Owner Trustee, Indenture Trustee, Administrator, and Note Insurer."  (*Id.* at 4.)  Finally, WilmerHale "received express consent from representatives of each of the Owner Trustee, Indenture Trustee, Administrator, and Note Insurer to execute the Proposed Settlement on behalf of the Trusts."  (*Id.*) This is sufficient to satisfy the Administration Agreement's requirement that the Indenture Trustee instruct the Administrator to settle the instant lawsuit.

While it is correct that the Owner Trustee did not have prior written approval from the Owners, PIMCO has not pointed to any authority stating that the path laid out in the Trust Agreement must be followed to the exclusion of the path laid out

in the Administration Agreement.  In fact, the Delaware Court expressly noted that there are two paths laid out in the Trust Related Agreements for settling non-ministerial litigation against the Trusts and that these two paths may even end in discordant results.  No party has provided any explanation of whether or how one path trumps the other.  Additionally, PIMCO has not argued that the form of consents given here are not proper under the Indenture.

PIMCO's argument that the "Indenture does not expressly state that the Indenture Trustee may resolve claims against the Trusts" is contradicted by the definition of "grant" in the Indenture including the right "to make waivers or other agreements, to exercise all rights and options, to bring Proceedings in the name of the Granting party or otherwise and generally to do and receive anything that the Granting party is or may be entitled to do or receive thereunder or with respect thereto[,]" as well as the Delaware Chancery Court's findings that the Indenture Trustee may settle claims "directly on behalf of the Trusts[,]" if they relate to the Collateral, and that the Indenture Trustee may also "direct the Administrator to negotiate and settle the lawsuit at the expense of the Trusts."  *NCSLT Governance Dispute*, 251 A.3d at 147–46.

Further, PICMO's comparison to the District of Delaware's decision in *CFPB I* is not persuasive because that case arose in completely different factual circumstances.  There, the Owners were attempting to settle a lawsuit against the

Trusts contrary to what the Owner Trustee thought was in the best interest of the Trusts. *Consumer Fin. Protection Bureau v. National Collegiate Master Student Trust*, No. 17-1323, 2020 WL 2915759, at * 2 (D. Del. May 31, 2020). In that case, the court noted that § 4.01(b) set limits on the Owner Trustee's ability to compromise litigation, but "does not empower the Owners or other agent of the Trusts to execute such instructions, *i.e.*, to assume the powers and responsibilities of the Owner Trustee to manage and direct the Trusts." *Id.* at * 4. This is factually different than here, where the Owner Trustee has given its consent to the proposed judgment and signed the documents required to execute the judgment. (Doc. 36, p. 4.)

Accordingly, because the path laid out in the Administration Agreement has been satisfied, the Trusts had authority to enter into the proposed settlement.[11] Thus, PIMCO's first objection is overruled.

### B. Noteholders' Contractual Rights

PIMCO objects to the proposed consent judgment because it allegedly violates the noteholders' contractual rights in the Trust Related Agreements. (Doc. 33, p. 22.) According to PIMCO, the noteholders' contractual rights are violated by the proposed judgment because it causes the Trusts to act inconsistently with

---

[11] Because the court finds that the Trusts had authority to enter into the proposed judgment due to the Administrator Agreement § 1(b)(i), the court will not address the arguments advanced by Trusts and the CFPB regarding § 8.06 of the Trust Agreement.

their purposes, the judgment impermissibly amends Basic Documents,[12] and the

proposed judgment was not entered into in the manner laid out by the Trust

Related Agreements.  The Trusts respond that "the Court does not need PIMCO's

consent to approve the Proposed Settlement [because] [t]he Proposed Settlement

does not impose affirmative obligations on noteholders." (Doc. 36, p. 13) (citing

*Local No. 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland*, 478

U.S. 501, 529 (1986)).   The CFPB argues that the proposed order does not violate

the terms of any Trust Related Agreement or amend the Servicing Guidelines, and

the May 1, 2024 Servicing Guidelines amendment did not require PIMCO's

consent.  (Doc. 37, p. 13.)  In its reply brief, PIMCO asks the court to "permit a

period of targeted discovery followed by additional briefing to resolve the

questions of contractual interpretation raised in the Objection on a complete

record." (Doc. 41, p. 13.)   The court will address each argument in turn.

### 1. Whether the Proposed Judgment Violates Terms of the Trust Related Agreements

PIMCO's first argument relating to noteholders' contractual rights is that the

proposed judgment violates the narrow purpose of the Trusts by "impos[ing] new

---

[12] The "Basic Documents" are "the Trust Agreement, the Indenture, all Student Loan Purchase Agreements, the Deposit and Sale Agreement, the Servicing Agreements, the Administration Agreement, the Back-up Administration Agreement, the Custodial Agreements, the Note Depository Agreement, the Guarantee Agreements, the TERI Deposit and Security Agreement, any Program Manual and other documents and certificates delivered in connection with any thereof. "  (Indenture, Appendix A; Doc. 34-2, p. 60; *see also In re NCSLT Litigation*, 251 A.3d at 162.)

obligations on the Trusts, which are both extensive and costly, and transform[ing] the Trusts' Role across the Trust Related Agreements." (Doc. 33, pp. 22, 23.) According to PIMCO, the Trusts have a narrowly defined purpose of "separat[ing] the Student Loans from the balance sheets of the financial institutions that first extended credit to the borrowers" and a limited set of activities designed to achieve that purpose. (*Id.* at 22) (quoting *NCSLT Governance Dispute*, 251 A.3d at 128); *see also* Trust Agreement § 2.03, Doc. 34-1, p. 12; Indenture § 3.12, Doc. 34-2, p. 19.)

According to PIMCO, the proposed judgment would require the Trusts to do activities not authorized by the Trust Related Agreements, namely, bears costs not contemplated by the Trust Related Agreements, bear "debts" that are not permissible under the Agreements, breach agreements to enforce the Basic Documents and uphold Collateral, and submit to the continuing jurisdiction of the court and supervision by the CFPB. (*Id.* at 23–25.) Further, PIMCO argues that "the Trusts are not authorized to 'sell, transfer, exchange or otherwise dispose of' their 'properties or assets,' except as permitted by the Trust Related Agreements[,]" and that the payments required by the proposed judgment are not authorized under the Indenture's payment priority provision. (*Id.* at 23.) According to PIMCO, the noteholders bear the consequences of these violations of the Trust Related Agreements, although it does not explain what those

consequences may be.  (*Id.* at 26.)  In summary, PIMCO argues the proposed

consent judgment impacts the noteholders' contractual rights without their consent.

(*Id.* at 26, 27) (citing *United States v. City of Hialeah*, 140 F.3d 968, 971 (11th Cir.

1998); *Bass v. Fed. Sav. & Loan Ins. Corp.*, 698 F.2d 328, 330-31 (7th Cir. 1938);

*United States v. City of Los Angeles*, 288 F.3d 391, 400–02 (9th Cir. 2002).)

Trusts respond that the proposed judgment "does not bind noteholders to do

or refrain from doing anything.  It does not create any legal duty or obligation on

noteholders.  And it does not release any legal claims noteholders might have."

(Doc. 36, pp. 13, 14.)  Further, the Trusts contend that the payment of the

settlement is "an appropriate use of the Trusts' funds under the payment priority

provisions of the Trust Related Agreements."[13]  (*Id.* at 14.)  Specifically, the Trusts

believe that payment of the monetary redress and civil penalty can be paid as an

"Administrator Expense," which has "priority over distributions to noteholders[,]"

or a servicer expense, "because they are costs relating to the servicing of student

loans[.]"  (*Id.* at 14, 15)  Per the Trusts, "Defendant PHEAA[] will be primarily

responsible for providing [Exception Request related] redress to consumers and

administering the Redress Plans under the Proposed Settlement."  (*Id.*)

---

[13] The "payment priority provisions" referenced by the Trusts are also referred to by the parties as the "Indenture Waterfall."  This provision of the Indenture, § 8.02(d), lays out the order of distributions to be made.  (Doc. 34-2, p. 40; Indenture § 8.02(d).)

The Trusts also argue that the costs imposed by the proposed judgment are not impermissible debts because "[t]he Trust Related Agreements contemplate settling claims against the Trusts." (*Id.* at 15) (citing Administration Agreement, § 1(d)(i)(B), Doc. 34-3, p. 4; Trust Agreement, § 4.01(b)(i), Doc. 34-1, p. 15).) The Trusts argue that "the Indenture cannot plausibly be read to mean that the Trusts are both precluded from settling claims brought against them and simultaneously immunized from the costs of litigation and potential judgment." (*Id.*)

Finally, the Trusts contend that the "non-monetary terms of the Proposed Settlement are all directed to the purpose of servicing the student loans and ensuring that the Trusts adhere to the terms of the Proposed Settlement[,]" and thus, do not violate the purposes delineated in the Trusts Related Agreements. (*Id.* at 17.)

The CFPB joins the Trusts' argument regarding the allocation of costs under the payment priority provisions in the Indenture. (Doc. 37, p. 14.) The CFPB adds that "[t]he Administration Agreement includes an expense cap of up to $400,000 per year for each of the named Trusts[,]" which would be approximately $6 million per year across all 15 Trusts, while the monetary requirements of the proposed judgment do not give any "indication that any payments would need to fall outside" this cap. (*Id.* at 15.) The CFPB also joins the Trusts' arguments regarding the non-monetary terms of the proposed judgment being within the scope

of the purposes and activities set out in the Trust Related Agreements.  (*Id.* at 17, 18.)

PIMCO replies by faulting the Trusts and the CFPB for not explaining each obligation imposed by the proposed judgment, but rather sweeping them all together as necessary and suitable or incidental to the Trusts permitted activities. (Doc. 41, pp. 8, 9.)  PIMCO then points to Trust Agreement § 2.03(a) as delineating the narrow activities the Trusts may engage in.  (*Id.* at 8.)  PIMCO again questions the propriety of the Trusts agreeing to pay for PHEAA's misconduct when there is "a broad indemnity right under the Servicing Agreement[.]"  (*Id.* at 10.)  PIMCO notes that the provisions allowing for payment of "fees and expenses" of service providers does not include "recoupment of settlement costs[.]"  (*Id.* at 11.)  The court will discuss each category raised by PIMCO in turn.

### a. Activities and Costs

In order to determine whether the proposed judgment requires the Trusts to undertake activities they are not permitted to under the Trust Related Agreements, the court first turns to Trust Agreement § 2.03(a), which provides:

(a) The purpose of the Trust is to engage in the following activities and only these activities:

(i) To acquire a pool of Student Loans, to execute the Indenture and to issue the Notes;

(ii) To enter into the Trust Related Agreements and to provide for the administration of the Trust and the servicing of the Student Loans;

(iii) To engage in those activities and to enter into such agreements that are necessary, suitable or convenient to accomplish the foregoing or are incidental thereto or connected therewith; and

(iv) To engage in such other activities as may be required in connection with conservation of the Trust Property and Distributions to Owners. Until the Indenture is discharged, the Trust shall not engage in any business or activities other than in connection with, or relating to, the foregoing and other than as required or authorized by the terms of this Agreement and the Indenture, except as are incidental to and necessary to accomplish such activities, unless the Interested Noteholders consent to the Trust engaging in other activities.

(Doc. 34-1, p. 12; Trust Agreement § 2.03(a).)  Further, according to the Indenture, "[t]he Issuer shall not engage in any business other than financing, purchasing, owning, selling and servicing the Financed Student Loans in the manner contemplated by this Indenture and the other Basic Documents and activities incidental thereto[,]" and "[s]o long as any of the Notes are Outstanding: (a) the Issuer [Trusts] shall not engage in any business or activity other than in connection with the activities contemplated hereby and in the Basic Documents, and in connected with the issuance of the Notes."  (Doc. 34-2, pp. 19, 23; Indenture §§ 3.12, 3.23(a).)  Thus, it is clear that the Trusts may not engage in any activity or business other than "in connection with the activities contemplated" by the Trust Related Agreements, such as "financing, purchasing, owning, selling and servicing the Financed Student Loans in the manner contemplated by this Indenture and the

other Basic Documents and activities incidental thereto[.]"  (Doc. 34-2, pp. 19, 23;

Indenture §§ 3.12, 3.23(a).)

As noted above, the proposed judgment against the Trusts requires four

broad categories of actions from the Trusts.  First, the Trusts must take steps to

implement servicing guidelines agreed to as part of the settlement, which

generally, institute processes and timelines for deciding exception requests.  (Doc.

3-2, ¶¶7–12.)  Second, the proposed judgment requires the Trusts and PHEAA to

set aside $2,886,817, in accordance with a separate cost allocation plan, in order to

pay redress to affected borrowers, as well as a statutory monetary penalty of

$400,000 to the CFPB, split between all Defendants.  (*Id.* ¶¶ 16, 44.)  Third, the

proposed judgment requires that Defendants formulate a plan for reviewing and

identifying potentially affected borrowers that may deserve redress.  (*Id.* ¶¶ 18–

43.)  Fourth and finally, the Trusts must submit their plans to modify servicing

guidelines and the redress plan to the CFPB for review as well as report to the

CFPB for five years after the implementation of the proposed judgment.  (*Id.* ¶¶ 9,

13, 54–68.)

It is clear that these actions are connected to servicing the student loans,

which is expressly contemplated by the Trust Agreement and the Indenture.  With

respect to the issue of the proposed judgment imposing costs, the Trusts and the

CFPB have explained why the monetary requirements of the proposed judgment

would be considered Administrator or Servicer expenses under the payment priority provisions.  The court concludes that the monetary requirements of the judgment do not deprive noteholders of any funds to which they were entitled. Perhaps more money will be allocated to the Administrator or Servicer than originally anticipated by the noteholders, but these allocations are still proper under the payment priority provisions if they do not exceed the cap established by the Agreements.  Accordingly, the court finds that the proposed judgment does not require the Trusts to perform any action or impose any costs contrary to the Trust Related Agreements.

### b.  Debt

Next, the court turns to PIMCO's argument that the proposed judgment requires the Trusts to undertake an impermissible "debt."  (Doc. 33, p. 23.)  The Indenture prohibits the Trusts from permitting "the validity or effectiveness of [the] Indenture to be impaired, or permit[ting] the lien of [the] Indenture to be amended, . . . or permit[ting] any Person to be released from any covenants or obligations with respect to the Notes under [the] Indenture except as may be expressly permitted[.]"  (Indenture § 3.08(iii)(A); Doc. 34-2, p. 17.)  Further, the Indenture also provides "[t]he Issuer shall not issue, incur, assume, guarantee or otherwise become liable, directly or indirectly, for any indebtedness except for the Notes."  (Doc. 34-2, p. 19; Indenture § 3.13.)

PIMCO does not explain how the costs under the proposed judgment are "debts" or create any claim against the Indenture Trust Estate.  Further, as the Trusts explain in response, the Trust Related Agreements expressly contemplate that the Trusts will need to settle claims against them at some point.  (Doc. 36, p. 15.)  Therefore, it cannot be that the Trust Related Agreements would both allow the Trusts to enter into settlements, but also consider settlement payments as "debts" which are not permitted.  Accordingly, the proposed judgment does not require the Trusts to submit to impermissible debts.

### c.  Promise to Enforce Basic Documents and Uphold Collateral

The final contractual right that PIMCO claims the proposed consent judgment affects is the promise made by the Trusts to enforce the Basic Documents and uphold the Collateral.  (Doc. 33, p. 24.)  Indenture § 3.07(c) provides that "[t]he Issuer [Trusts] will enforce all of  its rights under this Indenture and the Basic Documents[,]" and "except as otherwise expressly stated therein, the Issuer shall not waive, amend, modify, supplement or terminate any Basic Document or any provision thereof without the consent of the Indenture Trustee and the Interested Noteholders holding a majority of the Outstanding Amount of the related Classes of Notes."  (Doc. 34-2, pp. 16, 17; Indenture § 3.07(c).)  Further, in the Indenture, the Trusts agreed "that it will not, without the prior written consent of the Indenture Trustee and the Interested Noteholders

holding a majority of the Outstanding Amount of the Related Classes of Notes, amend, modify, waive, supplement, terminate or surrender, or agree to any amendment, modification, supplement, termination, waiver or surrender of, the terms of any Collateral or the Basic Documents, except to the extent otherwise provided therein[.]"  (Indenture § 3.07(f); Doc. 34-2, p. 17.)

PIMCO's argument in support of this objection is that the proposed judgment requires the Trusts to pay for a liability that PHEAA agreed to pay for in the Servicing Agreement, because the misconduct alleged in the complaint arises out of PHEAA's conduct.  (Doc. 34-4, p. 24.)  Servicing Agreement § 9 provides:

> The Servicer [PHEAA] agrees to pay for any claim, loss, liability or expense, including reasonable attorney's fees, which arises out of or relates to the Servicer's acts or omissions with respect to the Services provided under This Agreement . . . where the final determination of liability on the part of the Servicer is established by an arbitrator, by a court of law with competent jurisdiction over the Service or by way of settlement agreed to by the Servicer.

(Doc. 34-4, p. 24; Servicing Agreement § 9.)

These arguments from PIMCO misconstrue the proposed judgment because both the Trusts and PHEAA expressly do not admit or deny any sections of the complaint, and the CFPB releases both Defendants from liability for their actions. (Doc. 3-1, ¶¶ 2, 73.)  Thus, there has not been a final determination of liability either by a court, arbitrator, or settlement agreement.

Having considered whether the proposed judgment requires the Trusts to take actions or bear costs or debts contrary to the Trust Related Agreements, the court concludes that the proposed consent judgment does not contravene the Trust Related Agreements in these ways, and thus, noteholders' contractual rights are not breached in this manner. PIMCO's objection is overruled.

### 2. Whether the Proposed Judgment Improperly Amends Basic Documents

Next, PIMCO argues that the proposed judgment amends the Servicing Guidelines, which, per the Indenture, must be done with the consent of the Indenture Trustee and the Interested Noteholders. (Doc. 33, p. 27) (citing Indenture § 3.07(c), Doc. 34-2, p. 17.) Section 3.07(c) of the Indenture provides, in relevant part, "[e]xcept as otherwise expressly provided therein, the Issuer shall not waive, amend, modify, supplement or terminate any Basic Document or any provision thereof without the consent of the Indenture Trustee and the Interested Noteholders holding a majority of the Outstanding Amount of the related Classes of Notes." (Indenture § 3.07(c), Doc. 34-2, p. 17.) PIMCO contends that the proposed judgment violates this provision because it requires the Trusts to amend their Servicing Guidelines "to establish a process through which PHEAA may escalate certain borrower requests to a Trust-related entity . . . who must communicate a decision back to PHEAA within a set period of time" and also requires the Trusts to direct the Indenture Trustee, Owner Trustee, and

Administrator to modify their own policies in compliance with the proposed order without prior consent from the noteholders.  (Doc. 33, p. 28.)  PIMCO points to a recent Third Circuit decision interpreting the instant Indenture, in which the Third Circuit decided that a new servicing agreement including terms which did not appear in the Basic Documents could not be entered into without noteholder consent, according to the Indenture.  (*Id.* at 29) (citing *In re National Collegiate Student Loan Trusts 2003-1, 2004-1, 2004-2, 2005-1, 2005-2, 2005-3*, 971 F.3d 433, 449–50 (3d Cir. 2020) ("*NCSLT Servicer Dispute*").)  PIMCO concludes that "[b]y requiring the implementation of new servicing guidelines . . . the Proposed Consent Judgment has modified the Servicing Agreement without Noteholder consent."  (*Id.*)

The Trusts argue that "the Servicing Guidelines have been repeatedly amended from time to time without any noteholder consent."  (Doc. 36, p. 16.) The Trusts argue that the Indenture provides for this by allowing amendment of "the student loan program guidelines of each of the Sellers" to be amended without noteholder consent, as well as the "Servicing Guidelines themselves provid[ing] that amendments may be agreed to by . . . the Trusts, and the Servicer" but not mentioning noteholders.  (*Id.* at 16, 17.)

The CFPB argues that PIMCO's reliance on *CFPB Servicer Dispute* is inapposite because "there, unlike here, the Trusts had executed an entirely new

servicing agreement rather than following the procedures to amend the existing agreement." (Doc. 37, pp. 20, 21.)  The CFPB argues that "[t]he May 1, 2024, Servicing Guidelines Amendment is an agreement signed or acknowledged by all of the entities with any current role in NCSLT governance . . . and therefore properly amends the Servicing Guidelines." (*Id.* at 21.)  The CFPB further argues the only new obligations imposed by the proposed judgment are requirements for new policies to implement the May 1, 2024, amendment and the right of review retained by the CFPB. (*Id.* at 21, 22.)  Neither of these obligations alter the May 1, 2024, Servicing Guidelines. (*Id.* at 22.)

In reply, PIMCO argues that the section the Trusts rely on as "permitting amendment of servicing guidelines without noteholder consent" "does not expressly supplant the requirement for Noteholder consent found in the Indenture; it merely adds an additional consent requirement to ensure that the parties to the Servicing Agreement agree to its amendment." (Doc. 41, p. 12.)  PIMCO reiterates its reliance on *NCSLT Servicer Dispute*. (*Id.*)

The relevant portion of the Trust Related Agreements for this argument is Indenture § 3.07(c), which provides: "[e]xcept as otherwise expressly provided therein, the Issuer shall not waive, amend, modify, supplement or terminate any Basic Document or any provision thereof without the consent of the Indenture Trustee and the Interested Noteholders holding a majority of the Outstanding

Amount of the related Classes of Notes." (Doc. 34-2, p. 17; Indenture § 3.07(c).)

Additionally, Indenture § 3.07(f) provides:

> the Issuer agrees that it will not, without the prior written consent of the Indenture Trustee and the Interested Noteholders holding a majority of the Outstanding Amount of the Related Classes of Notes, amend, modify, waive, supplement, terminate or surrender, or agree to any amendment, modification, supplement, termination, waiver or surrender of, the terms of any Collateral or the Basic Documents, except to the extent otherwise provided therein[.]

(Doc. 34-2, p. 17; Indenture § 3.07(f).)

The important language that appears in both of these provisions is "otherwise provided therein." Both of these provisions apply to the proposed judgment, but there is an exception which carves out conduct expressly provided in the relevant Basic Document. The relevant Basic Document at issue here is the Servicing Agreement. The Servicing Agreement has a section regarding amendments to its terms, which provides:

> This Agreement, Exhibits or Schedules (a) may be amended, supplemented, or modified only by written instrument duly executed by FMC and the Servicer; (b) shall be incorporated into this Agreement; and (c) shall be binding upon and shall insure to the benefit of the parties hereto and their respective successors and assigns.

(Doc. 34-4, p. 39; Servicing Agreement § 15.09.) Here, the Administrator and the Servicer agreed by written instrument to amend the servicing guideline on May 1, 2024. (Doc. 37-1, ¶ 6.) Thus, the Servicing Guidelines have been amended as expressly provided in the Servicing Agreement.

PIMCO analogizes this case to *NSCLT Servicer Dispute*, but that case is again factually inapposite. *NSCLT Servicer Dispute* dealt with a Special Servicing Agreement "for the purpose of servicing two categories of non-performing loans, 'Defaulted Loans' and 'Delinquent Loans.'" *NSCLT Servicer Dispute*, 971 F.3d at 440. The Agreement "prohibited any amendment without the consent of 'the parties [thereto]' and 'the Administrator;' any amendment must also satisfy the Rating Agency Condition; and any successor servicer must be approved by the Indenture Trustee and be affirmatively approved by the Rating Agencies." *Id.* at 449 (alternations in original). Reviewing the Special Servicing Agreement, the court held that "the Trusts cannot circumvent Section 3.07(c) by entering a 'new' agreement for the servicing of Defaulted Loans that achieves the same result as an amendment without obtaining the required consents." *Id.* This holding is based on the incorporation of the consent requirements in the Special Servicing Agreement. In the Servicing Agreement with PHEAA that is before this court, the only requirements are that the Administrator and PHEAA implement the amendments "by a written instrument."

Thus, the May 1, 2024, servicing guidelines were implemented by written instrument signed by all of the necessary parties. Accordingly, the servicing guidelines were amended as expressly provided in the Servicing Agreement, as

authorized by Indenture § 3.07(c).  For this reason, PIMCO's objection is overruled.

### 3.  Trust Related Agreements Provisions for Entering into Settlements

PIMCO argues that, under the Trust Related Agreements, there are three ways in which the Trusts can settle a lawsuit against them, and none of those paths were followed here.  (Doc. 33, p. 30.)  First, PIMCO argues the Trusts could have amended or supplemented the Indenture by "provid[ing] prior notice to certain ratings agencies and obtain[ing] the consent of relevant Noteholders."  (*Id.*)  Second, PIMCO argues the Trusts could have instituted a "Trust Instruction Proceeding" under New York law because the Indenture is governed by New York law.  (*Id.* at 31.)  Finally, PIMCO argues the Owner Trustee should have obtained "the written approval of all Owners in compliance with the Trust Related Agreements."  (*Id.*)

In response to PIMCO's argument regarding the appropriate methods of compromising a lawsuit under the Trust Related Agreements, the Trusts argue that the court is the appropriate forum in which to settle this lawsuit.  (Doc. 36, p. 10.)  The Trusts argue that, according to statute, the "CFPB may compromise or settle claims brought in a civil enforcement action only if the settlement is approved by the Court."  (*Id.*) (citing 12 U.S.C. § 5564(c).)  The Trusts argue this method is not

contrary to the Trust Related Agreements, and further, that a Trustee Instruction Proceeding is not required by the Trust Related Agreements.  (*Id.*)

The CFPB argues that the Trust Related Agreements do not expressly set out "any required mechanism for a compromise of claims, besides authorization requirements[.]"  (Doc. 37, p. 18.)

As explained above, the proposed judgment does not require Trusts to undertake activities not anticipated by the Trust Related Agreements.  Thus, amending the Indenture is not required.  Additionally, as explained by Trusts, nothing in the Trust Related Agreements requires a Trustee Instruction Proceeding prior to entering into a proposed judgment.  As explained above, the Trust Related Agreements have mechanisms for settling non-ministerial claims against the Trusts.  One of them is outlined in the Trust Agreement, spearheaded by Owner Trustee.  The other is outlined in the Administration Agreement, led by the Administrator (with approvals by the Owner Trustee or the  Indenture Trustee).  Here, the Administrator, as well as the other Trust entities, engaged in the settlement discussions and the Administrator entered into this agreement after receiving instruction from the Indenture Trustee.  Accordingly, no other process was required.

In conclusion, after evaluating every argument advanced by PIMCO that the proposed judgment violates noteholder's contractual rights, the court finds that the

proposed judgment does not violate the noteholder's contractual rights, nor does it impose any obligation on the noteholders.  Therefore, PIMCO's objections are overruled.

### C. Fair and Reasonable

Finally, PIMCO argues the proposed judgment is not fair or reasonable because it "depend[s] upon a novel theory of vicarious liability: that the Trusts are vicariously liable for PHEAA's alleged violations of Section 1036[.]"  (Doc. 33, p. 32.)  PIMCO contends that "[i]t is neither fair nor reasonable for the Proposed Consent Judgment to assume the viability of this claim, particularly given its impact on the securitization industry."  (*Id.*)  PIMCO then proceeds to argue the merits of whether vicarious liability is a permissible theory of liability under the CFPA, pointing to one case that held it was a viable theory, but also noting that the Third Circuit has expressly not decided this issue.  (*Id.* at 33, 34.) (citing *Consumer Fin. Protection Bureau v. Manseth*, No. 22-CV-39, 2023 WL 5400235 (W.D.N.Y Aug, 22, 2023; *Consumer Fin. Protection Bureau v. National Collegiate Master Student Loan Trust*, 96 F.4th 599, 609 n.81 (3d Cir. 2024).) Then, PIMCO argues that, in its complaint, the CFPB did not establish that PHEAA is an agent of the Trusts in order to establish vicarious liability.  (*Id.* at 35, 36.)

The Trusts argue that the proposed judgment is fair and reasonable because negotiation "took place at arm's length, over the course of nearly a year[,]" and

moreover, those negotiations were undertaken with "substantive input from entities within the Trusts' governance structure." (Doc. 36, p. 12.) Further, the Trusts argue that the specifics of the proposed judgment are "narrowly tailored to address the CFPB's allegations, are informed by data regarding the 'Exception Requests' at issue, and reflect careful consideration of the relief the CFPB would have sought in contested litigation . . . as well as the practical limitations on the Trusts' ability to pay such amounts." (*Id.*)

Regarding PIMCO's argument about vicarious liability, the Trusts contend that they have not conceded liability under the proposed judgment, and note that the complaint also alleges counts against the Trusts directly, which are not reliant upon a theory of vicarious liability. (*Id.*) Thus, "there remains a meaningful risk that the Trusts could be found liable either directly or vicariously." (*Id.*) Accordingly, the Trusts argue the proposed judgment limits those risks by capping the Trusts' liability, as opposed to the prospect of protracted litigation. (*Id.* at 13.)

The CFPB argues the proposed judgment is fair and reasonable because it is "supported by the Trusts . . . , PHEAA, Administrator, Owner Trustee, Special Subservicer, Note Insurer, Indenture Trustee, and counsel for the Trusts." (Doc. 37, p. 23.) Further, the CFPB points out that no other noteholder group or any other entity objected to the proposed judgment. (*Id.*) Finally, the CFPB discounts PIMCO's "attempt to raise what are essentially Rule 12(b)(6) arguments" as an

objection and notes that the merits of the underlying lawsuit are not the driving

concern, but rather "whether the parties have negotiated a reasonable resolution of

the claims in the case." (*Id.* at 24.)

Turning first to the argument that the proposed judgment should not be

entered because it is "contingent in part on such a broad and novel claim" of the

Trusts being vicariously liable for PHEAA's actions, the court notes that neither

the Trusts nor PHEAA admit any allegations in the complaint.  Further, the

proposed judgment does not state that Trusts are vicariously liable for PHEAA's

action.  Because the court can approve a consent judgment that provide broader

relief than what may be proved at trial, and because PIMCO challenges only one of

five counts, the court does not find the proposed consent judgment to be

unreasonable.  This settlement is not injecting a novel theory into the world of

securitization because the proposed judgment reflects the consent of the parties to

resolve the instant action, not precedential law that vicarious liability is now an

approved theory of liability under the CFPA.  Moreover, the case provided by

PIMCO is not persuasive because the court in the Western District of New York

points out that the CFPA has provisions for holding "related persons" liable, and

this theory is similar, and perhaps coextensive, with vicarious liability. *Manseth*,

2023 WL 5400235 at *10-11

Finally, the court views this proposed judgment as fair and reasonable in these circumstances.  This agreement was negotiated between the CFPB and the various Trust entities at arm's length for almost one year.  (Doc. 36-1, pp. 3, 4.)  As argued by the Trusts and the CFPB, this resolution was reached with acknowledgment of what the Trusts could pay in redress in consideration of the Trusts' own financial state.  (Doc. 36, pp. 12, 13.)  The proposed judgment also appears to narrowly address the problem that the CFPB was investigating: the alleged failures of PHEAA and the Trusts to address borrower requests for exception.  The judgment requires the Trusts and PHEAA to fix this problem and to provide monetary redress to those affected.  This is fair and reasonable under the circumstances.  Moreover, because the proposed judgment does not impose any obligation or requirement on the noteholders or affect any of their bargained-for contractual rights, the proposed judgment is also fair and reasonable.  For these reasons, the joint motion for judgment will be granted.

## CONCLUSION

For the foregoing reasons, PIMCO's objections to the proposed judgment are overruled and the joint motion for judgment will be granted.  The court will enter the proposed orders.  (Docs. 3-1, 3-2.)

s/Jennifer P. Wilson<br>
JENNIFER P. WILSON<br>
United States District Court Judge<br>
Middle District of Pennsylvania

Dated: October 1, 2024